AMY W. SHERRILL, Appellee, v. MARTHA S.
MALLICOTE et al., Appellants. No. 67.
—417 S.W.(2d) 798.

Eastern Section. May 10, 1967.

Certiorari Denied by Supreme Court August 7, 1967.

242

H. H. McCampbell, Jr., Knoxville, for appellants.

Charles E. Rader, Knoxville, for appellee.

PARROTT, J.   This is a suit in chancery seeking to set aside an inter vivos trust. Amy W. Sherrill, widow of Max R. Sherrill, brought the action alleging a trust established by her husband approximately one year prior to his death was made with fraudulent intent and purpose to defeat the widow's distributive share in her husband's estate.

The defendants are the three sisters and two brothers of Max Sherrill who are beneficiaries under the trust, with two of the sisters also being sued in their capacity as trustees.

This cause was heard by the Chancellor on depositions. From his decree sustaining the original bill, declaring the trust invalid and ordering a reference to the master to determine the amount of the complainant's distributive share, the defendants have filed a broad appeal to this Court.

Chronologically, the following pertinent events occurred up until the time of the bringing of this suit.

Amy and Max Sherrill were married in 1954, Max being a 56 year old bachelor and Amy being a 40 year old widow with two young children by her first husband who died in 1946.

Prior to the marriage Max had lived on his Kingston Pike farm with his mother and spinster sister Ruby. Amy and her children were living at her house which was also located on Kingston Pike several miles east of the

Sherrill farm. After the marriage Max moved into Amy's home; Max's mother and Ruby remained on the farm. This arrangement continued until sometime in 1957 when Max's mother became ill and moved in the home of her daughter, the defendant, Martha S. Mallicote. In December 1960, the mother passed away.

On December 23, 1960, Max Sherrill suffered his first heart attack and was confined to the hospital until January 4, 1961. By the deposition of Dr. Acker there is evidence that Max was suffering from a heart condition since 1957. Apparently up until the death of Max's mother and this first heart attack, he and his wife had a fairly harmonious marriage.

It was the testimony of Amy and her children that after the heart attack Max became grumpy and inconsiderate. Shortly after Mother Sherrill's death Amy and Max commenced moving to the farm. They had the house completely redecorated but before the redecoration was completed, Amy and Ruby had a severe quarrel and Amy moved back to her house. Finally, some eight months later Ruby moved from the house and Amy and Max returned to the farm.

The relationship between Amy and the Sherrill in-laws was never one of great fondness, particularly between Amy and the sisters-in-law, Ruby Sherrill and Martha Mallicote. After the death of Max's mother and his heart attack, the relationship became even more strained and eventually developed into one of actual hatred. In the record it is shown that Ruby and Amy resorted to fist fights. Also, Martha and Amy had one or more altercations. Amy on one occasion ordered Martha from her home and on another occasion Martha refused to let Amy

in her home and much is said about Amy not being invited and failing to attend a Sherrill niece's wedding and parties. At Max's funeral they did not speak to each other.

The only reason we point out these hostile incidents is to show the feeling that existed. It cannot be said that the Sherrill sisters were solely responsible for the friction and animosity that existed. It appears from the record that Amy was just as willing to take part in these arguments and altercations as the Sherrill sisters. In fact the conduct of these people is deplorable. It is almost unbelievable that civilized intelligent people would act and treat each other as they have in the past.

Giving attention now to the Max Sherrill will and trust, each of these instruments was signed on the same day and both were prepared by Mr. Myron Ely, an able member of the Knoxville Bar who represented the Sherrill family for many years.

In December 1961, the defendant, Ruth S. Jonas, sister of Max Sherrill, came to Knoxville for her customary annual visit from her home in New York. While she was in Knoxville she and Max went to Mr. Ely's office. During this visit the disposition of Max's estate was discussed. It was Mr. Ely's testimony, which is undisputed, that Max informed him that he got his start from money which came from his father and mother and he thought it only fair, since he had no children, that a part of his estate should go to his brothers and sisters; in other words, should be returned to the Sherrill family. He further advised Mr. Ely that he wanted to make some provision for his wife.

After this first meeting in which Max explained to Mr. Ely his intentions, it was decided the stocks, which were the bulk of his personal property, would be placed in an irrevocable trust. Mrs. Jonas and Max came back to Mr. Ely's office for a second meeting during which the irrevocable trust was explained and Max readily agreed. Also, on this meeting the contents of the will were again gone over and Mr. Ely advised his clients that he would commence the preparation of the necessary documents.

Subsequently, these documents were completed and Max Sherrill and his sisters, Martha Mallicote and Ruth Jonas, came again to Mr. Ely's office. On this occasion, which was December 31, 1961, Max executed the will and the trust agreement with Ruth S. Jonas and Martha S. Mallicote executing the trust agreement as trustees.

The will provided that Amy would receive $2500.00 cash; one automobile; a life estate and the income, subject to her remarriage, from a store building in Sevierville, the 170 acre home-place farm located on Kingston Pike and a 75 acre farm in Blount County. All the residue of the estate, including the property devised to Amy at the expiration of her life estate, was bequeathed to Max Sherrill's brothers and sisters in equal shares. After probate of this will, Amy filed a dissent under T.C.A. 31-606 and laid claim to one-third of the estate as provided by the statute.

The corpus of the trust was made up of stocks and securities valued at $178,000. The agreement provided that Max Sherrill would receive the income during his lifetime.

The powers of the trustees are somewhat limited by the agreement. In the first article it is provided that the

trustees cannot sell, exchange or grant options on any of the corpus without the written consent of the settlor. Neither were they empowered to invest or reinvest, participate in any plan of reorganization, consolidation, merger, combination or other similar plan, etc. without the written consent of the settlor. Upon the death of the settlor the trust is to terminate and the corpus and undistributed income is to be equally divided among the beneficiaries who are the settlor's brothers Callon and Harold, his sisters, Ruby Sherrill, Ruth S. Jonas and Martha S. Mallicote.

Immediately after the execution of this trust the several shares of stock were taken from Max Sherrill's lock box and title transferred to the trustees. The new certificates were returned through the mail to Martha Mallicote and as each one came to her, she gave it to Max Sherrill who returned them to his safety deposit box where they remained until his death. As the various dividend checks came to Martha Mallicote, she endorsed her name and the name of Ruth Jonas on the checks and either gave them to Max or deposited them in his account. It was the testimony of Ruth Jonas that she never took any active part in the administration of the trust. It can also be concluded that Martha never took any active part in the management but everything was left to Max's discretion.

During the life of this trust, the trustees never had a bank account or filed any fiduciary income tax return. Neither did they make any decision as to whether the trustees would exercise certain stock rights or convert them to cash. The trust provided that the trustees would receive one-half of one per cent of the income for their services. There is no proof showing they were ever paid anything.

Upon the death of Max Sherrill the trustees made a distribution of the corpus and income to the beneficiaries within thirty days.

The existence of this trust was kept secret from Max Sherrill's wife. Other than the trustees and Mr. Ely, Max did tell his brother Callon about the trust. It was the testimony of Ruby and Harold Sherrill that they learned of the existence of the trust only after Max's death.

It was the testimony of Callon that his brother Max told him a short time before his death that before they were married, he had told Amy he was not going to give her his money and that she told him she did not want it but that now she wants everything. Also, his instructions to Mr. Ely as to the trust and the will bear out that he intended to place the greater part of his estate beyond the reach of his wife.

There is other evidence in this record which tends to show that Max intended to limit his wife's share in his estate. Other than the securities placed in the trust, he owned $5,000.00 in "E" Bonds which were in the joint names of Max and the defendant, Ruby Sherrill. Also, he had a $5,000.00 life insurance policy on which Ruby was beneficiary. There were other "E" Bonds in the amount of $1500.00 which were in the joint names of Max and his niece Rachel.

In fact, with the bank accounts and bonds going directly to the joint tenants and the life insurance going to the beneficiary, after the payment of the debts and inheritance taxes, there is little or no personal property left in the estate. About the only evidence we have as to the value of the estate is the federal estate tax return which was filed in the record. It shows Max Sherrill had a gross estate of

$478,255.72 of which the assets of the trust amount to $178,202.55. The properties in which Amy was given a life estate were valued at $196,000 on the tax return. The Sevier County store building was valued at $32,000; the 170 acre home place, $150,000; the Blount County farm, $14,000. The remaining real estate consisted of 30 acres on Kingston Pike valued at $21,000; 95 acres, more or less, on Keller Bend Road, Knox County, $24,000; 62 acres in Blount County, $22,000. Also included in the return is farm machinery, farm produce and cattle totalling $16,912.80 and cash and notes due of $5320.47.

The total debts of the estate, including taxes, are approximately $158,000.00.

■ It was the Chancellor's conclusion that the trust was established with the intent and purpose to deny the widow of a distributive share of the estate and constituted a fraud on the marital rights of the wife. We concur in this conclusion.

The facts and circumstances which support the Chancellor's conclusion and influence our concurrence are: (a) the transfer of the stocks to the trust was without consideration and without the consent of his wife; (b) the transfer was made shortly prior to death and with the evidence that death could have been anticipated; (c) the settlor retained the income from the corpus for his lifetime; (d) the stocks placed in the trust were a large proportion of the settlor's personal property. Also, there is evidence that Max Sherrill was fearful his wife was contemplating a divorce. This also could have motivated him to make every effort to try to preserve his estate. Amy testified, and it was undisputed, that the last two years of their marriage he persistently inquired as to whether or not she was going to file divorce proceedings.

All of these things tend to show the purpose and intention of Max Sherrill in establishing the trust was to keep his wife from sharing in the properties.

In cases of this type there can be no fixed rule of determining when a transfer or gift is fraudulent to a wife; each case must be determined on its own facts and circumstances. Generally, a gift or transfer inter vivos by a husband of his property, if absolute and bona fide and not made with a fraudulent intent, is not a fraud on the right of the wife to share in his estate at his death. However, the courts have voided such transfers when they have found them to be merely colorable—a device by which the husband is able to use and enjoy the property during him lifetime and at the same time deprive his wife of her rights in the property at his death, or if the gift or transfer was made with a fraudulent intent. See Annot., 49 A.L.R.2d 521; 26 Am.Jur., Husband and Wife, Sec. 201.

There are many factors which enter into determining whether the gift or transfer is colorable or has a fraudulent intent so as to be void. To be considered are: if the transfer was made without consideration; the size of the transfer in relation to the husband's total assets; the time between the transfer and the husband's death; relations which existed between the husband and wife at the time of the transfer; and the source from which the property came.

Intention and purpose are not necessarily the controlling factors in determining whether a transfer is fraudulent. One must take into consideration the effect of the transfer. In other words, if the properties transferred prior to death are of such a quantity in relation to the

total estate as the widow is substantially deprived of that which she would otherwise take under our statutes, then from such a transfer fraud may be presumed under certain conditions and circumstances.

In the instant case we believe the evidence brings this trust within the above category and the Chancellor was correct in voiding the same. It is our opinion the same rules pertaining to conveyances made with an intent to defeat a widow's dower rights are applicable to the present situation.

Our Supreme Court, in the case of Reynolds v. Vance, 48 Tenn. 344, at page 349, said:

"These facts are wholly inconsistent with the supposition that he had no intent or purpose to defeat his widow of dower, and that the conveyance was a bona fide gift, whereby he actually and openly divested himself of his property, and the enjoyment of it, in his lifetime, in favor of his children, thereby making, according to the circumstances, and the situation of his family, a just and reasonable provision for them, and not with the view to defeat, nor for the sake of diminishing the wife's dower."

See also McIntosh v. Ladd, 20 Tenn. 459.

Appellants, in their brief to this Court, strongly insist the Chancellor erred in applying T.C.A. 31-612 to this case. This statute provides:

"Conveyance to defeat dower voidable.—Any conveyances made fraudulently to children or others, with an intent to defeat the widow of her dower, or distributive share, shall be voidable, and such widow shall be

entitled to dower in the land so fraudulently conveyed, as if no conveyance had been made.''

In their argument they say T.C.A. 31-612, which is commonly known as our dower statute, offers no legal basis that a husband cannot convey away his personal estate during his lifetime. It is pointed out in the brief that the words ''or distributive share'' were not in this statute until 1932 and there has been no construction of the additional words by the appellate courts. They further argue that in adding the words, the legislature failed to specify what should be done in a case of a husband fraudulently conveying personalty. Thereby, it failed to provide any remedy.

We cannot follow appellants' construction of this statute. It is true, until the statute was amended, a husband had the absolute right of conveyance of personalty and the widow had no remedy by which she could impeach the conveyance. See Richards v. Richards, 30 Tenn. 429. It is our opinion the legislature, by adding the words ''or distributive share, shall be voidable,'' intended to obviate the very thing that was decided by Richards v. Richards, supra, and afford the widow a remedy. As we view the statute as amended, the only person who may bring a suit under it is the widow and the very purpose of enacting the statute was for the widow's benefit and protection. In the present case the widow has brought the suit seeking a distributive share of the estate under T.C.A. 31-606, which provides the widow, if she dissents from her husband's will, shall receive one-third of the personal estate of her husband if there be no children or if there be more than two children, the widow shall equally share with the children.

We think it goes without saying that the Chancery Court has inherent jurisdiction to set aside any fraudulent conveyance, voluntary gift or transfer. See Gibson's Suits in Chancery, Sec. 1013, 4th ed.

Thus it is our opinion the evidence in this case does not preponderate against the Chancellor's findings. Contrarily, it supports his finding that this transfer was made with the fraudulent intent to defeat the widow of her distributive share of the estate as provided by the statute and should be voided.

The costs of this appeal are taxed to the appellants and the cause is remanded.

McAmis, P. J., and Cooper, J., concur.