## FLORIDA FIRST NATIONAL BANK OF JACKSONVILLE, etc., et al. v. BAGLEY
### Case No. 79-9476-CA
Fourth Judicial Circuit, Duval County
September 24, 1982

James H. Sheehan, Sheehan & Ball, C. Harris Dittmar and John A. DeVault, III, Bedell, Dittmar, DeVault, Pillans & Gentry, for plaintiffs.

Thomas R. Prewitt, Sr., Armstrong, Allen, Braden, Goodman, McBride & Prewitt and John W. Wilbur, Wilbur & Allen, for defendant.

EVERETT RICHARDSON, Circuit Judge

This case came on for trial before the Court, sitting without a jury, on July 22 and 23, 1982. After consideration of the testimony, the exhibits, the argument of counsel and the briefs on the law filed by the parties, the Court makes the following finds of fact and conclusions of law.

### Findings of Fact

1. Julia Gustafson Bagley ("Julia") was one of six children, three boys and three girls, born to Frank and Agnes Gustafson ("Mama and Papa Gus"), who founded the family dairy business in Green Cove Springs shortly after the beginning of this century. The names and ages of the Gustafson children as of the date of trial are as follows:

F.N. (Noel) Gustafson—81
G. J. (Pete) Gustafson—79
Julia Gustafson Bagley (1906-79)
Helen Gustafson Amara—76
Ellen Gustafson Townsend—71
E.S. (Ed) Gustafson—66

(Test. E.S. Gustafson).

2. Having begun the Dairy with the purchase of one cow to provide milk for their children and later for their neighbors, the Dairy expanded during the lifetime of Mama and Papa Gus, and thereafter under the operation of Noel and his two brothers. At the present time, Gustafson Dairy, Inc. ("the Dairy") employs some 225 persons, is composed of 8,000 acres and has almost 8,000 cows. The Dairy is still located in Green Cove Springs and wholly owned and operated by the Gustafson family. (Test. E.S. Gustafson.)

3. Julia's first marriage was to Roswell Penney, the eldest son of J.C. Penney. There were no children born to that union, which ended in divorce in 1944. (Test. E.S. Gustafson.)

4. In 1944, Julia was married to the defendant, Thomas W. Bagley, while he was at the Navy base in Green Cove Springs, Florida. Shortly after the war, they moved to Memphis, Tennessee, Mr. Bagley's hometown, where they lived as man and wife until Julia's death. They had no children. (Stip. Facts, Paragraphs 1,2; Test. T.W. Bagley.)

5. In 1951, Mr. and Mrs. Bagley built their home in Memphis on ten acres of property owned by Mr. Bagley. Much of the money for the construction of the house, including some $17 to $18,000 raised by the sale of the home she received from Roswell Penney, came from Julia. (Test. T.W. Bagley.)

6. On November 2, 1956, Julia signed a Last Will and Testament (PX 1), prepared in the office of Jacksonville attorney Fred Kent, who long represented the Gustafson family. That Will, executed in Green Cove Springs, Clay County, Florida, bequeaths to the defendant, Thomas Bagley, Julia's wedding band and a one carat conventional diamond ring. The Will gives all of Julia's other jewelry to her sisters and to her niece and nephew, Sherwood Gustafson and Gail Gustafson Wagner, and divides the remainder of her estate, both real and personal, equally among her brothers and sisters. (PX 1.)

7. On July 1, 1966, Julia, together with all of her brothers and sisters, executed a stockholders' agreement (JX 9) which gave to the Dairy and to the other stockholders the right to purchase the shares of stock in the Dairy upon the death of any shareholder. (JX 9.)

8. J.W. Burke, a retired CPA, who from the mid 1950's until he retired in the mid 1970's, handled the accounting work and gave financial advice to the Gustafson family, was informed of a family plan initially formulated by Mama and Papa Gus, and agreed to by all the brothers and sisters. The family was concerned that none of the Dairy stock get into the hands of anyone outside the immediate family or into the hands of any spouse or child not directly working in and running the Dairy. As part of the plan, each of the brothers and sisters kept their monies received from the Dairy available for use by the Dairy in case of any emergency because the Dairy, as perhaps the largest Dairy in the United States in one location, was very vulnerable to disease such as bucolosis or to other disaster. The Gustafson family belived that all they had came from the Dairy and ultimately should return there. The stockholder agreements, wills and other financial planning of the Gustafson family were all designed to carry out the family plan. (Test. J. W. Burke.)

9. On July 15, 1968, Julia executed another will likewise prepared and witnessed by Fred Kent. (PX 3.) That will bequeathed the two pieces of jewelry enumerated in the earlier will to her husband, with the remainder of the jewelry going to Julia's sisters and niece and nephew. The remainder of her property, including the house in Memphis, Tennessee, was at the time of her death to be placed into a trust for the benefit of her sisters and brothers. Her three brothers were named the trustees of the Trust. (PX 3.)

10. On July 18, 1974, Doctor Hall S. Tackett of Memphis, Tennessee, informed Mr. and Mrs. Bagley that tests indicated that she had plasma cell myeloma, an incurable disease, involving the overgrowth of plasma cells. Dr. Tackett explained that the disease could be controlled by

medication and suggested she begin treatment with chemotherapy to arrest the disease, which she did. (Dep. Test. Dr. H. Tackett.)

11. In September, 1974, Julia set up a custody account at the Florida First National Bank of Jacksonville (''Florida National''), similar to custody accounts which had been previously set up by each of her brothers. After the establishment of the custody account, Julia transferred to that account from banks in Memphis, municipal bearer bonds valued at more than $300,000. These bonds had been purchased with funds provided her from dividends and royalties from the Dairy. For many years prior to this time, Julia had owned 35 shares of Dairy stock and her certificates, together with the certificates of each of her brothers and sisters, were located in the Dairy's safety deposit box at the Florida National Bank. (Stip. Facts Paragraph 9; Test. J. Sheehan; Test. T. Bagley.)

12. In late 1976 or early 1977, Jim Sheehan, then a tax partner with the accounting firm of Arthur Young, and now a practicing attorney specializing in tax and estates, reviewed the tax aspects of the 1968 wills of the Gustafson family at the directon of Mr. Burke. Mr. Sheehan estimated that the family members would pay more than $1 million in unnecessary estate taxes as a result of the provisions in those wills, which caused the assets of each deceased family member to be taxed again upon the death of each succeeding family member. In an effort to reduce these severe tax consequences, Mr. Sheehan suggested the preparation of revocable living trusts. (Test. J. Sheehan.)

13. The trusts were prepared by John B. Kent, who with his father, Fred Kent, was then representing the Gustafson family. A master trust was prepared for Noel, who was the eldest child and was then ill. Additional trusts were prepared for and executed by each of the other brothers and sisters. (JX 2-7.) The Trusts are similar in all essential respects, although the Trusts of two of the brothers provide income to their spouses during their lifetime. Julia confirmed to John Kent that it was her desire not to leave any income to her husband, the defendant Thomas Bagley, who was self-supporting. Each of these Trusts provided that ultimately all of the property of the brothers and sisters, including the Dairy stock, will pass to Sherwood and Gail, the son and daughter of Ed, both of whom are active in the Dairy, and who, accounting to undisputed testimony, are the only children of any brother and sister who have ever shown any interest in continuing the family business. (PX 7; Test. J. Kent; E. S. Gustafson.)

14. Subsequent to the establishment of her Trust, Julia endorsed the certificate representing her 35 shares of Dairy stock over to the Florida National Bank as corporate co-trustee and those shares were later

exchanged for new certificates reissued in the name of the Bank as co-trustee. Those certificates were in the Bank's possession on the date of Julia's death. Julia also transferred into the Trust all the assets from her custody account, and at various times thereafter, transferred cash money from banks in Tennessee to her Trust. As of the date of her death, the Bank as corporate co-trustee, held Trust assets in its possession consisting of the certificate of the 35 shares of Dairy stock, more than $100,000 cash, and municipal bearer bonds valued at more than $300,000. (Stip. Facts Paragraph 17.)

15. John Kent also drafted for Julia the Last Will and Testament executed July 1, 1977, which was admitted to probate following her death. (JX 1.) That will made no bequests to the defendant Thomas Bagley. In preparing that will, John Kent knew that Julia resided in Tennessee and after briefly researching the Tennessee law summary provided by Martindale, Hubbell (PX 8, 9), informed her that if the house in Tennessee were owned by the entireties and she predeceased her husband, he would receive the house, assuming that Tennessee and Florida law were the same on this subject. Julia specifically told John Kent that her family had put most of the money into the house in Tennessee, and that if he predeceased her, she wanted it to go back to the Dairy. (Test. J. Kent.)

16. After executing their own trust agreements, each of Julia's brothers and sisters likewise placed in their individual trusts, all of their shares of Dairy stock, and substantial other assets. (Test. G. Dismore.)

17. Julia died on March 28, 1979, in Memphis. The cause of death was disgnosed as erythroblastic leukemia, with pneumonia being another significant condition. (Dep. Test. Dr. H. Tackett.)

18. Julia's will and codicil were admitted to probate by the Probate Court of Shelby County, Tennessee. In that proceeding, the defendant, Thomas Bagley, duly dissented from the will and elected to take an elective or distributive share of one-third of Julia's net probate estate. (Stip. Facts Paragraph 13; Counterclaim Paragraph 5.)

19. Defendant Bagley received by operation of Tennessee law, the house owned by Julia and him as tenants by the entirety at 2154 Kirby Road, Memphis, Tennessee, together with 10 acres of property and all of the furnishings in the house. Defendant Bagley later sold the house and property for $400,000 cash and retained the furnishings. Bagley also received other personal property and $40,000 in cash, in settlement of his claim for a year's support under Tennessee law. (Stip. Facts Paragraph 14; Test. T. Bagley.)

20. The evidence fails to establish that the transfer of property by Julia to the Trust during her lifetime was for the fraudulent purpose of defeating the right of defendant Thomas W. Bagley to his distributive or elective share under Tennessee law. There can be no question from the evidence that Julia's intent and purpose in placing these assets into a trust, like those of her brother's and sister's, was (a) to diminish substantial estate taxes upon the deaths of each of the children; (b) to carry out the established and recognized family plan of bringing back to the Dairy all of the monies that came from the Dairy in accordance with Mama and Papa's instructions; and (c) to have available for use by the Dairy in the event of a disaster or emergency, substantial family assets. Coincident to this purpose was the fact that each surviving child would have available income from the Trusts of their deceased brothers or sisters. If, for example, Julia had been predeceased by her two older brothers, they would have been available to her (and to the defendant Bagley), income from trusts established by her two brothers which contained some 500 shares of Dairy stock, and in excess of $2.5 million in other assets.

## Conclusions of Law

1. The validity of an inter vivos trust is determined by the law of the state designated by the grantor "provided that this state has a substantial relation to the trust." Restatement (Second) Conflict of Law Section 270 (1969).

2. In determining the "substantial relation to the trust," the New York court in the leading case of *Hutchison v. Ross*, 187 N.E. 65 (N.Y. 1933), set forth the following factors in determining the law governing the validity of a trust:

    a. Place of execution of the trust;

    b. Location of the trust corpus;

    c. Settlor's intent that the trust be upheld; and

    d. Location of trust administration (187 N.E. at 70-71).

Other courts have consistently relied upon these factors in making their determinations as to the controlling law. *National Shawmut Bank of Boston v. Cumming*, 91 N.E.2d 337 (Mass. 1950); and *Warner v. Florida Bank & Trust Co. at West Palm Beach,* 160 F.2d 766 (5th Cir. 1947).

3. In the instant case, the Trust was executed in Jacksonville, Florida; the Trust corpus, which consists of personal property, was located in Jacksonville, Florida, both at the time of the creation of the Trust and at the settlor's death; the settlor clearly manifested her intent that the

Trust be upheld; the Trust had been administered in Florida; the Trust document provides for the application of Florida law; and all the beneficiaries of the Trust are citizens and residents of Florida. Thus, Florida law governs the validity of the Trust.

4. The powers reserved to the grantor in this case over the investment and disposition of the Trust assets are consistent with the provisions of Section 689.075, Florida Statutes (1981), and do not render the Trust either illusory or colorable. The fact that Julia had authority to exercise control over the assets of the Trust, and on occasion did exercise that control, does not render the Trust invalid or illusory under the law of Florida. *In re Estate of Herron*, 237 So.2d 563 (Fla. 4th DCA 1970). *Accord, Lane v. Palmer First National Bank & Trust Company of Sarasota*, 213 So.2d 301 (Fla. 2d DCA 1968); *Williams v. Collier*, 120 Fla. 248, 158 So. 815, rehearing denied 162 So. 868 (1935).

5. The right to an elective share under Florida law constitutes a mere expectancy of an heir which can be made non-existent by the completed sale or gift of the property prior to death. Redfearn, Wills and Administration in Florida, Section 19.03 (5th ed. 1977). Where the transfer is completed during the settlor's lifetime, as were the assets here in dispute, the intent of the transferor is immaterial. *Williams v. Collier*, 120 Fla. 248, 158 So. 815, rehearing denied, 162 So. 868 (Fla. 1935). See also *Libberton v. Libberton*, 240 So.2d 336 (Fla. 4th DCA 1970). Thus, even if defendant had established that the transfers were made for the purpose of defeating his elective share, because the transfers were complete at the time of Julia's death, they would not, under Florida law, be set aside.

6. For the reasons set forth above, Florida, not Tennessee, law applies to the construction of the Trust herein. However, even if Tennessee law were to be applicable, a consideration of the factors which the leading case relied on by defendant, *Sherill v. Mallicote*, 57 Tenn. App.241, 417 S.W.2d 798 (Tenn. 1967), indicates are determinative as to the "intent" of the settlor at the time of conveyance, shows that the transfers here would not be set aside under Tennessee law. Those factors (417 S.W.2d at 802) are:

1) Whether the transfer was made without consideration—Here, there was consideration by reason of the fact that the deceased brothers and sisters were entering into similar trust agreements which would have given Julia substantial additional assets during her lifetime had any of her brothers and sisters predeceased her.

2) The size of the transfer in relation to the husband's total assets—Here, the defendant Bagley received by operation of Tennessee law, the house and 10 acres which he sold shortly after Julia's

death for $400,000 cash; the furnishings in the house, and $40,000 for a year's support. In addition, as testified to by Mr. Bagley, he had substantial assets of his own at the time of Julia's death.

3) The time between the transfer and the decedent's death—Here, the Trust itself was created in June of 1977, almost two years prior to Julia's death, but the plan for the passage of the assets conveyed by the Trust was in existence at least from November, 1956, when she executed a will which would have conveyed her property in a similar manner.

4) The relations which existed between the husband and wife at the time of the transfer—There is no testimony to indicate that the relations between the decedent and the defendant played any part in the conveyances to the Trust, or the proposed dispositions under Julia's prior wills.

5) The source from which the property came—The evidence is uncontroverted that the property in the Trust came from distributions made to the decedent from the family Dairy and from a prior marriage, not from the joint efforts of the spouses during the marriage or from the defendant Bagley.

Accordingly, even if Tennessee law were to apply in this case, neither the requisite intent nor the requisite effect are present, so as to declare these conveyances voidable.

7. This action was properly instituted for the purpose of protecting trust assets and to assist the trustees in the performance of their duties. Section 737.402(2)(y)(z), Florida Statutes, 1981. Accordingly, the trustees are authorized to pay their costs of these proceedings, including reasonable attorneys' fees, from the assets of the Trust.