IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
January 6, 2004 Session

## WILL A. CANTRELL v. ALLEN CANTRELL

**Appeal from the Chancery Court for Giles County**
**No. 2045     Jim T. Hamilton, Judge**

---

**No. M2002-02883-COA-R3-CV - Filed December 30, 2004**

---

After the death of his estranged wife, the surviving husband discovered that she had secretly placed their marital residence into a revocable trust the assets of which, on her death, passed to the benefit of their son. The husband brought suit to have the transfer to the trust declared a fraudulent conveyance and to impose a resulting trust on the property for his benefit. The trial court granted him the relief he requested. While we agree with the trial court that the wife could not convey away the husband's interest in the farm, our reasoning and ultimate result differ from that of the trial court. We affirm the resulting trust, but reverse the voiding of the conveyance of the wife's half interest.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court**
**Affirmed as Modified**

PATRICIA J. COTTRELL, J., delivered the opinion of the court, in which WILLIAM C. KOCH, JR., P.J., M.S., and WILLIAM B CAIN, J., joined.

Jon L. Setzer, Nashville, Tennessee, for the appellant, Allen Cantrell.

Clark Anthony Edwards, Columbia, Tennessee; Robert D. Massey; Rogers N. Hays, Pulaski, Tennessee, for the appellee, Will A. Cantrell.

## OPINION

Will A. Cantrell and Margaret Henderson Cantrell were married on April 17, 1970. It was the first marriage for the wife, the third for the husband. The husband had three children from his earlier marriages. This marriage produced one child, Allen Cantrell, the defendant in this case, who was born on February 1, 1972.

The husband and wife both worked during their marriage. Margaret Cantrell was a schoolteacher with the Alabama public schools. Will Cantrell held a number of different jobs. In 1979, he retired with a medical disability from NASA in Huntsville. During the early years of their

marriage, the couple shared the financial benefits and burdens equally, paying their bills from a joint checking account into which they each put their earnings.

In 1971, the Cantrells purchased the farm on which Ms. Cantrell had grown up (her parents had rented the farm from relatives). The seller was Ms. Cantrell's aunt, Trannie Gobble. The purchase price was $40,000, which the parties have agreed was the fair market value of the property. The down payment of $1,000 and the installment payments to Ms. Gobble came from marital funds in the joint checking account. The two hundred one (201) acre farm was deeded only to Margaret Cantrell.

When the parties decided to build a house on their property in 1977, Will Cantrell went to the bank for a construction loan and learned for the first time that his name was not on the deed. The parties then had a "serious discussion" during which the husband asked his wife to add his name to the document, and she promised to take care of it. However, this was never done. The construction loan was written in the names of both Cantrells and was repaid through their joint checking account. Insurance and taxes were likewise paid from joint funds.

When Mr. Cantrell still had a job at NASA, he worked on the farm at night and on weekends. He testified that the land was extremely rocky and that he had to haul over 144 dump truck loads full of rocks, in order to be able to sow 75 or 80 acres for hay or grazing. After he retired, he continued to work the farm. The husband and wife shared the costs for feed and other expenses and shared the proceeds from the sale of cattle.

But this apparent harmony did not last. In the early 1990s, Will Cantrell became upset because he felt his wife was spending too much money on her extended family - chiefly her mother, father and sister. He was also aware that Margaret Cantrell did not approve of the amount of money he was spending on his children from his earlier marriages.

He therefore did not inform his wife when he inherited a one-third interest in a 100 acre farm that had been owned by his parents. He put cash from the same inheritance into a $17,000 Certificate of Deposit in his own name. In 1993, he opened a separate checking account for his own use. The husband and wife both remained in the marital home, but their marital relationship was replaced by a "profound separation." They lived essentially separate lives and maintained their separate finances. However, they continued to share in the proceeds from the farm (including rental income), and they both contributed to the payment of property taxes.

In January of 2000, Margaret Cantrell discovered she had cancer. She decided that she wanted all of her property to go to her son after she died, and that nothing should go to her estranged husband. On March 1, 2000, Allen Cantrell took his mother to an attorney in Nashville, where she executed three documents to accomplish these purposes.

The Margaret H. Cantrell Revocable Living Trust Agreement conveyed to the trust all of Ms. Cantrell's property "wherever situated, whether personal or real, tangible or intangible, separate or

community, and whether now owned or hereafter acquired. . . ." The document named Margaret Cantrell as both the trustor and the trustee. Allen Cantrell was named successor trustee in the event of her death.

The trust document further stated that "[i]t is the Trustor's intention that no distribution be made to her husband, William A. Cantrell, or any of his issue (with the exception of Allen Lewis Cantrell). Further, it is the Trustor's intention that no distribution be made to any descendants of her husband, even in the event that all of the Trustor's beneficiaries have predeceased the Trustor." Ms. Cantrell also executed a quitclaim deed, in which she surrendered to the trust all her interest in the 201 acre farm.

A Last Will and Testament executed at the same time includes a caption which describes it as a "'Pour-Over'" Will." It names Allen Cantrell as the executor of her estate, to serve without bond. The will directs that after payment of her just debts, the remainder of Ms. Cantrell's estate is to be given to the acting trustee of the living trust. Allen Cantrell was also the sole named beneficiary of his mother's teacher's retirement account, as well as of a variable annuity she owned.

Margaret Cantrell died on February 25, 2001. After his mother's death, Allen Cantrell, as successor trustee of the Margaret H. Cantrell Revocable Living Trust, conveyed the farm to himself individually. In a subsequent conveyance, he transferred it to a new entity, the Allen Lewis Cantrell Revocable Living Trust.

## I. PROCEEDINGS BELOW

Will Cantrell did not discover that his wife had engaged in these transactions until after her death. Eight months after her death, he filed a Complaint in the Chancery Court of Giles County, naming Allen Cantrell as defendant, both individually and in his capacity as Trustee of the Margaret H. Cantrell Revocable Living Trust. Will Cantrell asked the court to void his deceased wife's conveyance of the farm to the trust, under Tenn. Code Ann. § 31-1-105, as a fraudulent conveyance designed to defeat his rights.

Mr. Cantrell had earlier filed a Petition in the Probate Court of Giles County to be appointed administrator of his wife's estate. In that Petition, he declared his intention to dissent from his late wife's will, and to take his elective share under the law. He also filed a claim against her estate for "advancements" in the amount of $300,000. The Probate Court decided to hold its decision in abeyance pending the final outcome of the case in Chancery Court.

The Chancery Court conducted a hearing on Will Cantrell's Complaint on September 4, 2002. Both parties testified at length. The plaintiff also called three long-time neighbors, who testified briefly as to the plaintiff's honesty and the hard work they had observed him performing on the farm.

Allen Cantrell attempted to introduce into evidence a witnessed and notarized note, signed by Trannie Gobble. Ms. Gobble had died in July of 2001. Will Cantrell objected to consideration of the note under the Dead Man's Statute. The trial court sustained the objection, but allowed Allen Cantrell to make an offer of proof by having him read the note into the record.

In the note, Ms. Gobble declared that she had agreed to sell the farm only if it could be deeded entirely to her niece, Margaret Cantrell. She stated that she had reservations about putting Will Cantrell's name on the deed because of his previous marriages and his other children and that it was her intention, as well as her niece's, that the farm should pass down exclusively to her lineage if Margaret should predecease her husband.

At the conclusion of the hearing, the court took the matter under advisement. The court's subsequent Order, filed on September 25, 2002, decided the most significant issues in Will Cantrell's favor. The court specifically found that the transactions by Margaret Cantrell, with the assistance of her son, "were done secretively and with the sole intent to deprive William Cantrell of his interest in said property" and also that the conveyance of the house and farm was made fraudulently "with the intent to defeat William A. Cantrell, her surviving spouse, of his distributive or elective share," and that "the conveyance was illusory."

The court accordingly declared the conveyance of the farm to be void, imposed a resulting trust on the property, and awarded a one-half undivided interest in it to Will Cantrell. The court also found that there was insufficient evidence to show that the change of beneficiaries to the retirement and annuity funds was a fraudulent transfer under Tenn. Code Ann. § 31-1-105. Allen Cantrell appealed.

## II. ISSUES ON APPEAL

It is important to distinguish the different interests Will Cantrell may have in the property transferred, or attempted to be transferred, to the trust. First, as a surviving spouse, he has a right to an elective share of his wife's separate property. Tenn. Code Ann. § 31-4-101. The farm was included in the property transferred to the trust, and that transfer was voided by the trial court, with the result that the entire farm was placed in Margaret Cantrell's estate.

However, Will Cantrell also claims an equitable ownership interest in the farm such that the farm would not be considered Margaret Cantrell's separate property. In recognition of this interest, the trial court imposed a resulting trust on the farm of a one-half undivided interest for the benefit of Will Cantrell. Allen Cantrell characterizes the result of these two holdings as allowing "double dipping" by Will Cantrell and an unconscionable disregard for the testator's wishes.

We believe it is important to analyze the separate interests Will Cantrell may have in the farm, which is apparently the only significant asset of the estate. In fact, this record tells us little about any other assets except the annuities or retirement accounts, and Will Cantrell has not appealed the trial court's ruling as to those assets.

-4-

### III. THE FARM AND THE RESULTING TRUST

Even though the farm was titled in the wife's name alone, the trial court concluded that Will Cantrell retained an equitable interest in the property which his wife was not entitled to convey away. The court accordingly imposed a resulting trust in favor of Will Cantrell on a one-half undivided interest in the farm.

A resulting trust is an equitable remedy to be used to satisfy the demands of justice. *Burleson v. McCrary,* 753 S.W.2d 349, 352 (Tenn. 1988). This court has described resulting trusts as "judge-created trusts or doctrines which enable a court, without violating all rules of logic, to reach an interest in property belonging to one person yet titled in and held by another." *Wells v. Wells,* 556 S.W.2d 769, 771 (Tenn. Ct. App.1977).

Its purposes include preventing unjust enrichment and protecting an individual's equitable right to property when the legal title to that property is in the name of another. *In re Estate of Nichols,* 856 S.W.2d 397, 401 (Tenn. 1993).

> Such a trust is implied by law from the acts and conduct of the parties and the facts and circumstances which at the time exist and surround the transaction out of which it arises. Broadly speaking, a resulting trust arises from the nature or circumstances of consideration involved in a transaction whereby one person becomes invested with a legal title but is obligated in equity to hold his legal title for the benefit of another, the intention of the former to hold in trust for the latter being implied or presumed as a matter of law, although no intention to create or hold in trust has been manifested, expressly or by inference, and there ordinarily being no fraud or constructive fraud involved.

*In re Estate of Nichols*, 856 S.W.2d at 401 (quoting 76 AM.JUR.2d *Trusts* § 166, pp. 197-98 (1992)).

Depending on the circumstances presented, a court will decree a resulting trust to prevent a failure of justice. *Id*. "These trusts are sometimes called presumptive trusts, because the law presumes them to be intended by the parties from the nature and character of their transactions. They are, however, generally called resulting trusts, because the trust is the result which Equity attaches to the particular transaction." *Roach v. Renfro,* 989 S.W.2d 335, 340 (Tenn. Ct. App. 1998) (quoting Gibson's Suits in Chancery, § 382 (Inman, 6th Ed. 1982)); *see also Smalling v. Terrell,* 943 S.W.2d 397, 400 (Tenn. Ct. App. 1996).

Although resulting trusts, by their nature, are normally established by parol evidence, *see Smalling*, 943 S.W.2d at 400, a high standard of proof must be met in order to impose a resulting trust. *Saddler v. Saddler,* 59 S.W.3d 96, 99 (Tenn. Ct. App. 2000); *In re Estate of Roark*, 829 S.W.2d 688, 692 (Tenn. Ct. App.1991). One reason is that too liberal an application of the equitable remedy would tend to generally undermine the value of legal title. Our Supreme Court has noted that the creation of a resulting trust is not a means to avoid the law of inheritance or of joint

tenancies. *In Re Estate of Nichols*, 856 S.W.2d at 402. Only under compelling circumstances may a court impose a resulting trust in contravention of the legal effect of the documents themselves. *Id.*

> While an implied or resulting trust may be established by parol evidence, yet both upon reason and authority the courts will not enforce it, unless it be established by the most convincing and irrefragable evidence. In other words, it must be sustained by proof of the clearest and most convincing character. To sustain a resulting trust upon parol evidence in the teeth of the terms of the written instrument, it is not essential that the evidence be of a character to remove all reasonable doubt, but only that it be so clear, cogent and convincing as to overcome the opposing evidence, coupled with the presumption that obtains in favor of the written instrument.

*In Re Estate of Nichols,* 856 S.W.2d at 402, quoting *Estate of Wardell ex rel. Wardell v. Dailey,* 674 S.W.2d 293,295 (Tenn. Ct. App. 1983), quoting *Savage v. Savage*, 4 Tenn. App. 277, 285 (1927); *Roach*, 989 S.W.2d at 341.

## IV. Tenn. Code Ann. § 31-1-105

A fundamental principle of the law of wills is that a testator is entitled to dispose of the testator's property as he or she sees fit, regardless of any perceived injustice that may result from such a choice. *In re Estate of Eden,* 99 S.W.3d 82, 92 (Tenn. Ct. App. 1995). Husbands and wives are likewise generally entitled to individually dispose of their separate property during their lifetimes by sale or by inter vivos gift. *Sherrill v. Mallicote,* 417 S.W.2d 798, 804 (Tenn. Ct. App. 1967). An important exception to the principles of testamentary freedom and free alienability of property, however, is that a testator is not entitled to completely disinherit his or her surviving spouse. Andra J. Hedrick, Note, *Protections Against Spousal Disinheritance: A Critical Analysis of Tennessee's New Forced Share System*, 28 U. Mem. L. Rev. 561 (1998).

The common law recognized that a surviving spouse retains rights to a portion of a deceased spouse's property, even in the face of a will or of another instrument that purports to convey away that property. Under the names of dower (for a wife's rights) and curtesy (for a husband's), those rights have been part of the law of Tennessee from its very beginning. *See Warren v. Compton*, 626 S.W.2d 12, 15-16 (Tenn. Ct. App. 1981).

The scope of those traditional rights and the terminology used to describe them have been altered to reflect modern concepts of matrimonial and gender equality and are generally governed by statute. They are now referred to as the surviving spouse's elective or distributive share. In the most current version of the elective share statute, Tenn. Code Ann. § 31-4-101, the share of the decedent spouse's separate property that goes to a surviving spouse who elects against a decedent spouse's will increases with the duration of the marriage. In a marriage of nine or more years (like the one at issue in this case), the surviving spouse's share would amount to 40% of the net estate. Tenn Code Ann. §31-4-101(a)(1).

Tenn. Code Ann. § 31-1-105 was specifically designed to protect a surviving spouse's interest in the property of the deceased spouse. It reads as follows:

> Any conveyance made fraudulently to children or others, with an intent to defeat the surviving spouse of the surviving's spouse distributive or elective share, is, at the election of the surviving spouse, includable in the decedent's net estate under § 31-4-101(b), and voidable to the extent the other assets in the decedent's net estate are insufficient to fund and pay the elective share amount payable to the surviving spouse under § 31-4-101(c).[1]

This court has had several opportunities to apply Tenn. Code Ann. § 31-1-105. Although "(i)n cases of this type there can be no fixed rule of determining when a transfer or gift is fraudulent" and each case must be determined on its own facts and circumstances, *Sherrill,* 417 S.W.2d at 802, the courts have articulated factors for trial courts to consider when determining whether a conveyance should be considered to have been fraudulently made to defeat the elective share of the surviving spouse. Those factors are: 1) whether the transfer was made without consideration; 2) the size of the transfer in relation to the total assets of the donor-spouse; 3) the time between the transfer and the death of the donor-spouse; 4) the relation which existed between the husband and wife at the time of the transfer; 5) the source from which the property came; (6) whether the transfer was illusory; and (7) whether the surviving spouse was adequately provided for in the will. *Finley v. Finley*, 726 S.W.2d 923, 924 (Tenn. Ct. App. 1986); *Warren*, 626 S.W.2d at 17; *Sherrill,* 417 S.W.2d at 802. In determining whether the conveyance was fraudulently made with an intent to defeat the spouse's interest, "the Court should not mechanically list the factors favorable to one party and those favorable to another and add up the total and base his judgment upon that alone, but instead, should consider the weight and significance to be given to each factor under the facts of each particular case." *Finley*, 726 S.W.2d at 925-926.

In the *Warren* case, *supra*, this court applied the factors and found that a $40,000 gift that Oliver Warren, the deceased husband, had made to his girlfriend, Opalyne Compton, shortly before he died was not a fraudulent conveyance. We reasoned that Mr. Warren's donative intent was justified by the long relationship between Mr. Warren and Ms. Compton, and the care and attention she gave him during the difficult months of his last illness.

We observed that "a strained marriage relationship is a sword which cuts both ways." That is, the existence of such strains under factor (4) above could be used as proof of a testator's motivation to fraudulently defeat a spouse's rights. But, on the other side of the equation, "[t]he surviving spouse could have been so inconsiderate, cold, and self-centered as to justify a transfer of

---

[1] At the time of Margaret Cantrell's death, the statute's wording was different; an amendment in 2002 substituted "at the election of the surviving spouse, includable in the decedent's net estate under § 31-4-101(b), and voidable to the extent the other assets in the decedent's estate are insufficient to fund and pay the elective share amount payable to the surviving spouse under § 31-4-101(c)" for "is voidable at the election of the surviving spouse." Neither party has pointed out the difference in the two versions of the statute nor indicated that the difference has any consequence to the issues in this appeal.

property by the other spouse to those in whom he found solace, comfort, and care." 626 S.W.2d at 18.

In the case before us, the trial court voided Margaret Cantrell's conveyance of the farm in its entirety, finding it a fraudulent transfer designed to deprive Will Cantrell of his elective share.

## V. ANALYSIS

While we do not disagree with most of the trial court's findings of fact, we cannot agree that the result reached by the court is necessitated by those findings. Although the court found that the transfer of the farm was made with the intent to defeat the interest of William H. Cantrell, it is not clear whether the court meant Will Cantrell's equitable ownership interest in the farm, his surviving spouse's share of his wife's separate property, or both.

We think the real problem here is that Margaret Cantrell attempted to convey away not only her property, but also Will Cantrell's interest in that property. We do not disagree that one of her primary purposes in transferring the property to the trust was to deprive Mr. Will Cantrell of any interest in the farm, but we think that her attempt was directed primarily at any claim he might have to being joint owner of the farm.

The trial court found that Will Cantrell contributed in excess of 50% to the marital funds with which the farm was purchased and that Margaret Cantrell treated the farm as being owned equally by herself and her husband. There can be no doubt that the husband and wife both made significant contributions to the acquisition and improvement of the property upon which they resided. The land itself was purchased for fair market value and was paid for out of marital funds. Repayment of the construction loan for the house likewise came from the income generated by both husband and wife. Additionally, Mr. Cantrell contributed many hours of back-breaking labor to improve the land by removing rocks from the soil.[2] Even though they lived essentially separate lives for the last seven to ten years of their marriage, they continued to reside together in the marital home. Even though they maintained separate finances during that time, they shared the proceeds and expenses of the farm equally. These facts indicate an intent, or recognition, that the farm and the house belonged to both of them equally.

Like the trial court, we find the record includes proof of the clearest and most convincing character of Mr. Cantrell's contributions to the acquisition and improvement of the disputed property, as well as of the numerous ways the husband and wife consistently treated the property as

---

[2]There is no doubt that the property in question would meet the definition of marital property subject to equitable distribution found in the divorce statute, which includes: "all real and personal property, both tangible and intangible, acquired by either or both spouses during the course of the marriage," and "any increase in value during the marriage of, property determined to be separate property in accordance with subdivision (b)(2) if each party substantially contributed to its preservation and appreciation." Tenn. Code Ann. § 36-4-121(b)(1).

jointly-owned.[3]  We must therefore conclude that the trial court was correct to impose a resulting trust on one-half of that property for Mr. Will Cantrell's benefit.[4]

Thus, although Margaret Cantrell attempted to convey the farm and house to the trust, such conveyance would not have been effective as to Will Cantrell's interest in that property.  Simply stated, you cannot convey what you do not own.  *Briggs v. Estate of Briggs*, 950 S.W.2d 710, 713 fn.2 (Tenn. Ct. App. 1997); *Lebovitz v. Porter*, 252 S.W.2d 144, 147 (Tenn. Ct. App. 1952).  More accurately, in the case before us, the conveyance was subject to the husband's equitable interest.  The trial court's imposition of a resulting trust for one-half interest effectively accomplished formal recognition of the consequence of that legal principle.  Will Cantrell is entitled, upon request, to reformation of the deed to accurately reflect his one-half interest in the real property.

The trial court's imposition of a resulting trust as to one-half the property means that the other half was owned by Margaret Cantrell.  We agree with this conclusion.  Consequently, the factors relevant to a determination under Tenn. Code Ann. § 31-1-105 must be applied to Margaret Cantrell's transfer of her one-half interest in the farm.

Although there are some factual differences, there are some striking similarities between the case before us and *Warren v. Compton*, discussed above.  In particular, both testators had made the challenged conveyances shortly after learning that they were suffering from life-threatening illnesses, and in both cases the marital relationship between the parties had been functionally over for quite some time.

Like Mrs. Warren, who did not even visit her husband during his month-long stay in the hospital, Mr. Cantrell was neither solicitous nor supportive of his wife during her last illness and showed little concern.  He testified that he did not know what kind of cancer she was suffering from, did not know the name of any of her doctors, and did not know anything about her chemotherapy treatments.  In answer to the question whether he had ever spent a night at the hospital when she was suffering, he said "I think I stayed a night or two," but he also said "I didn't even know when it was she was in the hospital."

Margaret Cantrell looked to her son for comfort and care, not only during her last illness, but also during the last ten years of her life.  While Mr. Cantrell worked on the land, his wife worked full time as a schoolteacher, did all the household chores and cooked for her family.  As he was

---

[3]Mr. Will Cantrell has not argued that the property was owned as tenants by the entireties.

[4]On appeal, Allen Cantrell argues that the trial court improperly excluded the written statement of the seller of the farm.  We do not think the seller's intent has any bearing on our decision on whether a resulting trust should have been imposed.  The farm was purchased with joint money, the house was financed with the proceeds from a loan for which the parties were jointly obligated, and the parties' conduct showed a recognition of joint ownership.  Consequently, whether Ms. Gobble's statement was improperly excluded from evidence or not, the trial court allowed a proffer, we have reviewed the statement, and find its admission would not have affected the outcome of the case.  *See* Tenn. R. App. P. 36(b).

growing up, her son Allen sometimes helped his father with the farm labor, but he chose to help his mother with the housework on a daily basis. Will Cantrell apparently believed that since he worked so hard outside, he had no obligation to help his wife in any way with the requirements of maintaining a home, despite the fact that she held down a full-time job and he did not.[5]

Allen Cantrell went away to college, and moved to Nashville after graduating. But after his mother was diagnosed with cancer, he made frequent visits to Giles County to help her. He arranged for repairs to the house, visited her in the hospital, and stayed there with her when necessary. He paid her funeral expenses out of his own funds.

The factors related to a determination of whether an inter vivos conveyance was a fraudulent attempt to deprive a surviving spouse of his or her elective share are meant to be guidelines to help the court determine whether the intent of the testator was such as should invoke the spousal protections of Tenn. Code Ann. § 31-1-105. Will Cantrell contends that most of those factors should incline this court toward affirming the finding of fraudulent intent. He points out that there was no monetary consideration for the transfer to the trust and that there was a relatively short interval between the conveyance and Margaret Cantrell's death. He also notes that Ms. Cantrell made no provision for her husband in her will. He concedes that the relationship between husband and wife was broken, but argues that we should not rest our decision on any single factor.

Some of the husband's arguments are based on factors that are relevant to his equitable ownership, such as that his own labor was at least in part the source of the property transferred. Our conclusion affirming the resulting trust to preserve his one-half interest in the farm makes such arguments and factors less relevant to, or at least less persuasive on, the issues surrounding Ms. Cantrell's conveyance of her one-half interest in the farm.

Allen Cantrell argues to the contrary that three of the five *Warren* factors support a finding of donative intent. Aside from the strains in the relationship between his parents, he argues that the consideration for the transfer was his love, support and affection for his mother, and that his mother's family was the ultimate source of the farm property.

After thoroughly examining the record, we believe that the proof shows that in attempting to convey the farm to her son, the testator was motivated by several distinct but mutually reinforcing considerations. First, the conveyance demonstrated and was a product of her love and gratitude toward her son for the support, care and consolation he gave her during the last ten years of her marriage. Second, she lacked similar feelings or affection for her husband. To the contrary, she was at least partially motivated by her anger and resentment toward her husband for withdrawing all

[5]Allen Cantrell gave extensive testimony as to his father's conduct in the home, which illustrates the great gulf that had opened up between husband and wife. For example, he testified that "[s]he would spend all weekend long cleaning. All weekend long cleaning from ceiling to floor, two levels of the house. And he would come in from whatever it was he had been doing, hay or working on the farm, walk through the house with muddy clothes, muddy boots, track it all over the floor. And didn't care. He would sit in the chair and eat bananas and fruit and throw the peelings on the floor and on the carpet. He did not help my mother in the least amount. The only help that she had was me."

emotional and other support from her during the same time period. Mr. and Mrs. Cantrell, as much as being angry and resentful toward each other, however, displayed simple disinterest in each other. Significantly, both spouses had disentangled themselves from any real marital relationship in every practical sense during the years before her death.

Finally, Ms. Cantrell clearly wanted to keep the farm within her own lineage, to the exclusion of her husband and his descendants except their son. This desire, however, was unattainable due to the parties' conduct prior to the transfer. She could not effectively deprive Mr. Cantrell of his equitable interest in the farm they both treated as jointly owned. With regard to her one-half interest, however, it appears to us that the testator acted out of a legitimate and justifiable donative intent. *See Warren*, 626 S.W.2d at 18.

In *Sherrill v. Mallicote*, *supra*, we stated that "[i]ntention and purpose are not necessarily the controlling factors in determining whether a transfer is fraudulent. One must take into consideration the effect of the transfer." 417 S.W.2d at 802. In the case before us, had Margaret Cantrell's attempt to convey the farm in its entirety to her son been effective, her estate would have been without its significant asset. Voiding that entire transfer would have allowed Will Cantrell to elect to take 40% of the farm.

However, establishing the resulting trust to protect Will Cantrell's equitable interest in the farm results in his taking 50% of the farm. This result is equitable. Allowing Will Cantrell to take a 50% ownership interest in the farm and also to allow him to elect a 40% share of Margaret Cantrell's remaining half interest in the farm, as the trial court's holdings could be interpreted, would not be equitable.

It appears to us, therefore, that Ms. Cantrell's conveyance of her one-half interest in the farm to a trust for the ultimate benefit of her son should not have been declared a fraudulent conveyance under Tenn. Code Ann. § 31-1-105.

## VI. CONCLUSION

The order of the trial court is reversed in regard to voiding the conveyance of the farm, but it is affirmed in regard to the establishment of a resulting trust on one-half of the property for the benefit of Will Cantrell. We remand this case to the Chancery Court of Giles County for any further proceedings necessary. Tax the costs on appeal equally between the appellant, Allen Cantrell and the appellee, Will Cantrell.

_____
PATRICIA J. COTTRELL, JUDGE