**Marie Krantz WARREN,
Plaintiff-Appellant,**

v.

**Opalyne COMPTON, Defendant-Appellee,**

**Ouida Mae Turri, Defendant-Appellant,**

**Charles W. Abernathy, Executor of the Estate of Oliver Carr Warren, Defendant.**

Court of Appeals of Tennessee, Western Section.

Sept. 1, 1981.

Rehearing Denied Oct. 9, 1981.

Permission to Appeal Denied by Supreme Court Dec. 28, 1981.

Joseph P. Rutledge, Jr., Memphis, for plaintiff-appellant.

Robert E. Rose, Memphis, for defendant-appellee Compton.

Erich W. Merrill, Memphis, for defendant-appellant Turri.

MATHERNE, Judge.

Based upon the provisions of T.C.A. § 31–105, the plaintiff Marie Krantz Warren, the widow of Oliver Carr Warren, sues to set aside two transfers of personalty as having been made by the husband with the intent to defeat her of her distributive or elective share in his estate. The statute provides as follows:

> 31–105. Fraudulent conveyance to defeat share voidable.—Any conveyances made fraudulently to children or others, with an intent to defeat the surviving spouse of his distributive or elective share, is voidable at the election of the surviving spouse. [Acts 1976 (Adj.S.), ch. 529, § 1; 1977, ch. 25, §§ 4, 5]

One transfer was a $40,000 certificate of deposit the husband purchased in the name of his girl friend, the defendant Opalyne Compton and delivered to her. The other transfer was the husband's delivery of two notes worth $17,300 and payable to him to the defendant Ouida Mae Turri, his daughter by a previous marriage.

By final decree the chancellor held that the transfer of the $40,000 to Opalyne Compton was valid, and it was "sustained as a conveyance which was not colorable or made with fraudulent intent." The chancellor further held that the delivery of the two notes by the husband to his daughter be "set aside as an illusory transaction made with an intent to defeat the plaintiff [widow] of her distributive or elective share in her husband's estate" and entered judgment in favor of the widow and against the daughter for one-third of the value of the notes.

The plaintiff-widow appeals the decision which upheld the transfer of $40,000 to Opalyne Compton, insisting that (1) the chancellor erred in his interpretation of Tennessee law by holding that in order to void such a transfer the court must find it "illusory" or "colorable" only, (2) the chancellor erred in finding the $40,000 transfer was a "gift . . . made for a good and valuable consideration," and (3) the chancellor erred in his failure to find that the conveyance was made with fraudulent intent as to her.

The defendant-daughter appeals the chancellor's holding that the transfer of the two notes, totaling $17,300 in value, to her was void as to the widow, insisting that (1) the transfer was completed by actual delivery of the notes and was not illusory, and (2) the transfer was not made with fraudulent intent as to the widow.

## I. BACKGROUND

The Warrens were married in 1957, it being the second marriage for the wife and the third for the husband. The wife had some property, including a house in which the parties lived, which she acquired from her first husband's estate and from her own employment. She had one son, who lived with the Warrens after the marriage. The husband was a building contractor and at the time of the marriage he was experiencing financial troubles. The wife supported his business by advancing money to him and by actually helping with certain aspects of the business. The wife testified that she was never repaid the advancements she made, but she did not with any degree of particularity establish the amount of those advancements. The husband's business prospered, and he left, according to the brief of counsel for the plaintiff-wife, a net estate for distribution of about $255,000, after deducting $58,500 which he claims is not available for distribution. The bulk of his estate consisted of a note in the original amount of about $225,000, executed to him by a church for payment of a building constructed for the church by the husband and financed by him.

Prior to the marriage, Mr. Warren was personally acquainted with Opalyne Compton. This relationship was resumed within

a few months after the marriage. Opalyne testified that for at least 15 years prior to his death Mr. Warren had his evening meals at her home, but he never spent the night there until in December 1976.

In about April or May 1976, Mr. Warren was diagnosed as suffering with cancer of the lungs. On about December 3, 1976, his doctors told him that his illness was terminal, and that he had only six months to one year to live. As had been his custom for many years, Mr. Warren visited his daughter in December 1976 at her home in Florida. Upon his return to Memphis he did not go back to the marital home, but went to the home of Opalyne Compton. He remained there for the rest of his life except for about one month in the hospital during May 1977. He died at Opalyne's home July 16, 1977.

Before he visited his daughter in December 1976, Mr. Warren asked Opalyne to quit her work and take care of him. She agreed, gave notice to her employer of about 24 years, quit her job, and upon his return from Florida she devoted her full time to his care. On Christmas Eve night 1976 Mr. Warren gave Opalyne a certificate of deposit payable to her in the amount of $40,000. On January 4, 1977, he executed a will which, after a specific bequest of $1,000 to his step-son, provided for his wife as follows:

> I give, devise and bequeath to my wife, Marie Krantz Warren, that portion of my estate she would be entitled to by law assuming that I had not made satisfactory provisions for her and she had dissented from the provisions of this my Last Will and Testament.
> I am advised of the fact that certain changes in these laws will be effective April 1, 1977, and it is my express intent that the laws as are applicable at the time of my death be controlling.

By subsequent provisions he devised one-half of the remainder of his estate to his daughter and one-half to Opalyne Compton. The parties agree that the surviving spouse is entitled to one-third of the net estate as set out in Chapter 25, Public Acts 1977, effective April 1, 1977.

On April 18, 1977, Mr. Warren made a loan to his daughter and her husband of $15,000 for the purpose of assisting the husband in setting up his own business. The daughter and husband executed their note of that date payable to Mr. Warren in the amount of $15,000, due in 60 monthly payments of $375 each beginning July 15, 1977. Also, on May 7, 1977, Mr. Warren made a loan of $3,500 to his daughter's son and took his note of that date, in that amount, payable in $100 monthly payments beginning May 15, 1977.

While Mr. Warren was hospitalized in May 1977, his daughter left her home in Florida, came to Memphis, and along with Opalyne cared for him for about one month during his confinement. When she left to return to her home, Mr. Warren gave her the two above mentioned notes which had a total unpaid balance of $17,300.

## II. THE STATUTES and CASE LAW

The genesis of T.C.A. § 31–105 is chapter 22 section 8 of the Acts of North Carolina adopted at Hillsborough on April 19, 1784. See 1 Acts of Tennessee, page 295, Scott's Edition (1821). That statute related only to the dower interest of a widow in the lands of her deceased husband and provided that "any conveyances made fraudulently to children or otherwise, with an intention to defeat the widow of [her] dower, shall be held and deemed to be void, and such widow shall be entitled to dower in such land so fraudulently conveyed...." That provision was followed by the courts of Tennessee, and no further legislation was enacted on the subject until the identical provisions were carried over as section 2406 of the Code of 1858.

The courts of Tennessee have interpreted the foregoing statutes to apply only to conveyances made by the husband with the actual intent to defeat the widow of her dower interest in the land conveyed, which intent may be inferred from circumstantial evidence. *Hughes' Lessee v. Shaw* (1827) 8 Tenn. 323. The lack of full consideration standing alone is not sufficient evidence to

infer an intention to defraud. *McIntosh v. Ladd* (1840) 20 Tenn. 459. A conveyance made fraudulently with intention to deprive the widow of dower seem not at all to apply to a *bona fide* advancement of real estate to a child, whereby the husband actually and openly divests himself of the property, and the enjoyment thereof, according to the wants of the child and the condition of the husband's property and family. *McIntosh v. Ladd, supra.* The act applied only to the widow's dower interest and did not relate to transfers of personalty made by the husband. *Richards v. Richards* (1850) 30 Tenn. 429. It matters not that a fair consideration was paid for the land, if the sale was made fraudulently with the intent to defeat the widow of her dower interest, it is voidable as to her. *Brewer v. Connell* (1851) 30 Tenn. 500. The act could be asserted only by the widow, and then only to the extent of recovering her dower interest in the land conveyed. *Rowland v. Rowland* (1855) 34 Tenn. 543. The intent of the husband at the time of the conveyance governs. *Reynolds v. Vance* (1870) 48 Tenn. 344.

The Code of 1932 amended the statute by providing, as follows:

Any conveyance made fraudulently to children or others, with an intent to defeat the widow of her dower, or distributive share, shall be voidable, and such widow shall be entitled to dower in the land so fraudulently conveyed, as if no conveyance had been made.

The 1932 Code added the words "or distributive share." In *Sherrill v. Mallicote* (1967) 57 Tenn.App. 241, 417 S.W.2d 798, these words were held to have the effect of making the statute applicable to fraudulent transfers of personalty which deprived a widow of her distributive share. That view was upheld in *Fillmore v. Fillmore* (1971) 225 Tenn. 423, 470 S.W.2d 11.

The statute was further amended by chapter 529, acts of 1976 to read as follows:

Any conveyance made fraudulently to children or others, with an intent to defeat the surviving spouse of a distributive share, shall be voidable at the election of the surviving spouse.

This statute, codified as T.C.A. § 31–612, was obviously designed to eliminate the word "widow" in favor of the words "surviving spouse," and to eliminate the word, "dower" which estate was abolished by the same enactment. Later, by chapter 25, acts of 1977, the statute was further amended to read as it now appears at T.C.A. § 31–105. The effect of this last amendment was to strike the words "a distributive share" and to insert the words "his distributive or elective share." We fail to find a reported Tennessee decision after *Fillmore* dealing with this statute.

Obviously, the statute has been drastically changed since its enactment in 1784. It now applies to the surviving spouse instead of to the widow, and it applies to the rights of the surviving spouse in a distributive or elective share in the entire estate of the deceased spouse. There is, however, one aspect of the statute that has remained constant, namely, before the statute is applicable the transfer of property must have been made fraudulently with an intent to defeat the rights of the complaining spouse. Case law under the prior statutes on the issue of what is a fraudulent transfer with an intent to defeat the rights of the complaining spouse will govern.

We disagree with the arguments made that the chancellor based his findings on whether the respective transfers were illusory. Admittedly, he found the $40,000 transfer not to be "colorable" only, and he found the $17,300 transfer to be illusory. In each case, however, he based his holding on the intent of the donor-spouse to defeat the rights of the surviving-spouse; no such intent was found in the $40,000 transfer, but it was found in the $17,300 transfer. In the light of the verbiage of the *Sherrill v. Mallicote* opinion, the chancellor is not to be overly faulted for referring to the illusory aspects of the transfers. In fact some members of the profession construe *Sherrill* as permitting the voidance of a transfer under either the fraudulent intent test or the illusory test. See 36 Tennessee Law Review 604 (1969).

Under the authority of *Reynolds v. Vance, supra,* we disagree with the above stated interpretation of *Sherrill.* In *Reynolds* the husband conveyed all his land to his three children. The deed on its face purported to be a sale for $3,000, whereas only $300 was paid; the deed was absolute and entitled the grantees to immediate possession, however, the husband remained in possession and control over the land until his death eight years later; even though the deed was acknowledged for recording, it was not recorded until after the husband's death. At the suit of the widow the court voided the transfer to the extent of her dower interest. The court did not void the transfer because it was illusory—the court found that under the above facts the conveyance was made with the intent to defeat the widow of her dower.

Under the authority of *Reynolds, supra,* and other cases heretofore cited, we hold that the only time the statute is applicable is where there is a fraudulent transfer with the intent to deprive the surviving-spouse of his or her share of the estate of the donor-spouse. If a transfer is in fact illusory, that is one factor to consider in determining the intent of the donor-spouse, but the intent to defeat the rights of the surviving-spouse must be found to exist at the time of the transfer in order to make the statute applicable. *Reynolds v. Vance, supra.*

We agree with *Sherrill, supra,* wherein the court states "(i)n cases of this type there can be no fixed rule of determining when a transfer or gift is fraudulent to a wife [surviving spouse]; each case must be determined on its own facts and circumstances." See also *Reynolds v. Vance, supra.*

The *Sherrill* court listed the following factors to be considered in determining the fraudulent intent of the donor-spouse: 1) whether the transfer made without consideration, 2) the size of the transfer in relation to the total assets of the donor-spouse, 3) the time between the transfer and the death of the donor-spouse, 4) the relation which existed between the husband and wife at the time of the transfer, and 5) the source from which the property came. We agree that these factors are important in determining the intent of the donor-spouse. However, we do not limit our considerations to those factors alone. Circumstances which establish fraudulent intent are as varied as the ingenuity of the human mind may devise. All facts and circumstances surrounding the transfer must be considered.

### III. THE TRANSFERS

The marriage relationship between the Warrens was most unusual. The plaintiff widow attempts to paint a picture of a very harmonious marriage. Her statements, however, are contradicted by the facts and her own acts. Mr. Warren would arrive home late each night, he did not care for anything to eat, and she understood that his work detained him. In fact, Mr. Warren ate his evening meals at Opalyne's home every day except Sundays for a period of 15 years. When he learned of the terminal nature of his illness, he immediately requested Opalyne to quit her work and care for him during this last illness. He moved into Opalyne's home and did not in any manner rely upon his wife for care or comfort. Mrs. Warren testified that he would call her from Opalyne's home once or twice each day, and told her he was at the home of a couple who were taking care of him; he would not tell her where he was staying, and he refused her many requests that he return home. In about March 9, 1977, she learned that he was at Opalyne's home. She made no effort to contact him, being satisfied that "they" did not want her to see him. In about May 1977, Mr. Warren spent a month in the hospital. Mrs. Warren did not visit him there even though she knew he was there and realized the seriousness of his illness. Mr. Warren's daughter, Ouida Mae Turri, came from her home in Florida, and she and Opalyne took shifts of being with him every hour of each day. There is no showing that Mr. Warren ever requested the presence of his wife. We, therefore, conclude that this marriage was

not as harmonious as Mrs. Warren would have us believe. The widow's attorney insists that this strained relationship is a factor which aids in establishing fraudulent intent on the part of Mr. Warren. We would point out that a strained marriage relationship is a sword which cuts two ways. The surviving spouse could have been so inconsiderate, cold, and self-centered as to justify a transfer of property by the other spouse to those in whom he found solace, comfort, and care. We do not necessarily approve of Mr. Warren's acts, but we are not trying a divorce lawsuit. We are determining whether the transfers were made with the intent to defeat the rights of the surviving spouse. The chancellor heard these people testify and observed their demeanor. He apparently found that the strained marriage relationship, taken in consideration of all other factors, did not establish a fraudulent intent on the part of the husband. We agree.

■ At one time, Mr. Warren made a statement to his business associate that he did not want his wife to have any of his property. The widow claims that this fact conclusively establishes that the two transfers were made with the intent to defeat her marital rights. We note, however, that regardless of that statement, Mr. Warren by his will gave to his wife exactly what she was entitled to under the law. We hold that other provisions for the surviving-spouse, whether made by will or gift, are to be considered on the issue of fraudulent intent on the part of the donor-spouse. We would have a different situation had Mr. Warren absolutely left his wife out in his will—such an attempted disinheritance could be found to establish a fraudulent intent in the two transfers under consideration.

It is argued that even though Mr. Warren provided for his wife as required by law, he depleted his estate to the extent of $57,300 by the two transfers, which amount is of such significance as to infer fraudulent intent on his part. As heretofore noted, the widow's counsel values Mr. Warren's estate at about $313,500 of which amount he claims $58,500 is not available for distribution.

■ We agree with the widow that when considering the amount of the transfers in relation to the total estate, the total of all transfers will be used. It matters not to the surviving-spouse if there be one or ten transfers. It is the amount by which the estate was depleted which must be considered on the issue of fraudulent intent on the part of the transferor. Under the circumstances, we hold that the amount of the transfers in relation to the total estate is not so great as to infer fraudulent intent on the part of the donor-spouse.

Counsel for the widow disagrees with the chancellor on his finding that the transfer of $40,000 to Opalyne was "a gift for valuable consideration." Counsel argues that it is impossible to have a gift based on valuable consideration. That may be true, but we feel that counsel is taking the chancellor's verbiage a bit too literally. No doubt the transfer was a gift. Opalyne testified that there was no agreement that she would be paid for her services during the husband's last illness or for past services. He asked her to care for him, and she did. She stated that she agreed to his request because of her love and affection for him, and that she would never attempt such an undertaking as a paid employee. The task which Opalyne undertook was very difficult, demanding, and demeaning. Mr. Warren was bedridden, unable to control his bodily functions, took medication regularly day and night, and required constant around-the-clock attention. These duties Opalyne performed with the aid of part-time help during the day.

We hold that the $40,000 gift to Opalyne was made out of the gratitude, appreciation, concern, love, and affection Mr. Warren held for her. When the chancellor mentioned "consideration," we feel that he had these factors in mind. Under all the circumstances, we hold that Mr. Warren had a donative intent toward Opalyne which was justified by their long relationship and her care and attention during his last illness. There is no mention of fraud or deceit on

the part of Opalyne which might have induced Mr. Warren to make the gift. We hold that this donative intent on the part of Mr. Warren prompted the gift and that the transfer was not made with the intent to defeat the rights of the surviving-spouse.

■ We hold that the chancellor erred in finding the transfer of the two notes by Mr. Warren to his daughter to be illusory. In her pleadings, the daughter averred that when Mr. Warren gave her the two notes he stated that he knew that if he needed the interest during his lifetime, she (the daughter) would let him have it, but that she could tear up the notes or do whatever she wanted to with them. These notes were physically delivered to the daughter, and she took them to her Florida home.

■ The word "illusory" is defined in Black's Law Dictionary, page 918, 3rd Edition (1933), as "deceiving by false appearances; nominal as distinguished from substantial." As used in defining a transfer of property we treat the word as meaning that the transferor retained such elements of ownership and control over the property as renders the purported transfer deceptive, incomplete and misleading—a pretended transfer rather than a real transfer.

The statement by Mr. Warren that he knew the daughter would let him have the interest if he needed it did not in any manner condition the gift of the notes to her. This statement could only have the effect of showing Mr. Warren's trust in his daughter. The gift was complete and the daughter became the true owner of the notes.

We also hold that the chancellor erred in finding that this transfer was made with the intent to defeat the rights of the surviving spouse. Mr. Warren and his only daughter enjoyed a very close relationship. Even though he had never given her at any one time anything as costly as the gift of the two notes, he had consistently over the years given her expensive gifts, trips, and education expenses of her child. These notes reflected intra-family financing, and it is not at all unusual for Mr. Warren to

desire that these matters be cleared in his lifetime. This is a situation where he wished to resolve this problem, remove those debts, and settle the family affairs before his death. These reasons are logical, persuasive, and acceptable. Compare the reasoning in *McIntosh v. Ladd* (1840) 20 Tenn. 459, where it is held that reasonable gifts by the husband aimed at settling the family affairs are not to be considered as made with fraudulent intent toward the wife. We hold that the gifts of the two notes were so motivated and were not made with the intent to defeat the rights of the surviving spouse.

### IV.  CONCLUSIONS

We affirm the chancellor in his finding that the $40,000 gift to Opalyne Compton was a valid gift *inter vivos*, and it was not fraudulently made with the intent to defeat the rights of the surviving spouse. We reverse the chancellor's holding that the gift of the two notes totaling $17,300 to Ouida Mae Turri was illusory and made with the intent to defeat the rights of the surviving spouse. We hold the gift of the two notes was a valid *inter vivos* completed gift. This lawsuit is dismissed, and the costs in the chancery court and in this court are adjudged one-third against each of the parties Marie Krantz Warren, Opalyne Compton and Ouida Mae Turri, for which execution may issue, if necessary.

NEARN, J., dissents.

INMAN, Special Judge, concurs.

NEARN, Judge, concurring and dissenting.

While I agree with the results reached by the majority I must dissent from their interpretation of T.C.A. § 31–105.

In a most scholarly manner the majority opinion traces the ancestral lines of T.C.A. § 31–105 to its primogenitor, the state of North Carolina. Then, the cases dealing with the statute and subsequent legislative amendments thereto are analyzed and concatenated to form a chain of pertinent decisions from the earliest times to the latest.

It is a job well done and I find but one fault with it and that fault is the basis of this dissent.

It appears to me that no Court of this state has yet directly dealt with the full import of the 1932 amendment to the statute. The reported cases since 1932 deal with the addition of the words "or distributive share" as found in the 1932 amendment. Important as that may be, the change that has great significance to me is the deletion of the word "otherwise" as previously found in the statute and the substitution or addition of the word "others" in its stead. Prior to 1932, the statute provided "any conveyance made fraudulently to children or otherwise, etc.". To me, the old statute meant any conveyance made to children fraudulently or otherwise with an intent to defeat the widow's dower interest was void. In other words, if, by the conveyance the deceased intended the diminution of the widow's right, which right did not come into existence until the death of the spouse, the conveyance would be presumed to be fraudulent and void. That seems to me to be the holdings and pronouncements of the Courts prior to the 1932 amendment. However, such ascribed meaning left to the Courts the task of reading a dead man's mind in order to ascertain his motivation in making the conveyance. Such a task is difficult to say the least; especially when the law will not recognize ouija boards or seances as legitimate Court tools to assist in making that determination. Accordingly, each case had to be determined on its own "peculiar" facts with the end result, of necessity, usually being based upon some degree of judicial guesswork.

Now, the statute reads, and has read since 1932, "any conveyance made fraudulently to children or others, etc.". The substitution of the word "others" for "otherwise" radically altered the meaning of the statute in my opinion. It is no longer a conveyance fraudulently or "otherwise" made, that is subject to being set aside by a surviving spouse. It is now only fraudulent conveyances to others, that are subject to judicial scrutiny at the behest of the surviving spouse. To my mind, there is a world of difference between the two. In its present form the statute renders void only those conveyances which are first fraudulent. That is to say, if it is a bona fide conveyance, that is, one where the grantor has freely and completely parted with the ownership of the thing conveyed, either by outright gift or for monetary or other consideration, without any fraud having been perpetrated upon the grantor by any third person, the conveyance is not a fraudulent one. In short, if the conveyance is not fraudulent, the grantor's motivation behind the conveyance matters not. Therefore, either spouse can sell, give away, throw away or use up whatever is exclusively his or hers during his or her lifetime so long as the conveyance is not a sham or a subterfuge (fraudulent) whereby control over the thing is seemingly fully parted with but actually is not. The spouse may not during life by subterfuge and fraud actually retain all the fruits and rights of ownership after having facially parted with the thing and then upon death, through an administrator or executor say "It was not mine at the time of my death and therefore my surviving spouse has no rights therein." To say so is to lie and the law will not permit it. However, if the conveyance was a true conveyance and not a sham, the deceased did not die possessed of it or any interest in it and no right could attach in the surviving spouse. In my mind, this heretofor unrecognized change in the statute is a salutary one, because under the old statute every conveyance or gift made during coverture was subject to attack by the surviving spouse with results being dependent upon the deceased's ethereal motivation as determined by a Court. We are not yet a community property state and I see nothing wrong or evil in permitting one to finally dispose of ones property during ones lifetime according to ones own wishes even if the effect of the disposition is to leave a smaller estate for someone who may or may not survive the grantor. Statutory law permits one to act after death and dispose of one's assets. A dead man has no rights except those allowed by law to dispose of

assets after death. But, during life a citizen has or ought to have the right to dispose of his or her property as seems fit. No doubt there are those who would say that this construction of the statute would permit one to leave his or her surviving spouse practically destitute. It would. However, factual situations can be presented to show the other side of the coin. It would also permit one, while living, to give to the deserving, while the old statute prevented it. If a woman chooses to give everything she has to her children while she is living rather than leave an estate and have her drunkard husband, whom she has supported all her life, share in her estate as he is required to by law (and she is powerless to prevent it even by will)—what is wrong with that? Under the old statute the law effectively required one to leave an estate so it could be shared in by a surviving spouse, even if the spouse was totally undeserving. A citizen, married or not, ought to have the right to die without any estate whatsoever if he or she chooses, and I believe the statute in its present form so permits.

I agree with the holding of my colleagues that both of the conveyances in question in this case were completed and entire. Therefore, they were not fraudulent. Having reached that conclusion, my inquiry would stop there and the subject of the deceased's motivation would not be a subject of my inquiry. Motivation would be a legitimate subject of judicial inquiry when the conveyance was shown to be a fraudulent one. However, the surviving spouse would have no standing to set aside even a fraudulent conveyance unless it was made with intent to deprive the survivor of a distributive share. Not every fraudulent conveyance made would be made with that intent. The motivations for fraud are limitless.

Therefore, while I agree with the results reached, I do not concur in the interpretation of the statute indulged in by the majority opinion.

Done at Jackson in the two hundred and sixth year of our Independence and in the one hundred and eighty-sixth year of our Statehood.

Opinion and Order on Petition to Rehear

A Petition to Rehear has been filed by counsel for Opalyne Compton which is simply a reargument of matters previously considered by the Court.

Accordingly, the petition is denied at petitioner's cost.