IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs March 25, 2014

## NORMA SIMPSON, IND. AND NEXT OF KIN OF J. W. SIMPSON v. FAYE FOWLER

**Appeal from the Chancery Court for Obion County**
**No. 28448      W. Michael Maloan, Chancellor**

**No. W2013-02109-COA-R3-CV - Filed April 22, 2014**

This is the second appeal of this case, involving the application of Tennessee Code Annotated Section 31-1-105 to set aside certain transfers by decedent to his long-term companion, which transfers were allegedly made with intent to deny his surviving spouse of her share of his estate. From the totality of the circumstances, and applying the factors outlined by this Court in ***Finley v. Finley***, 726 S.W.2d 923 (Tenn. Ct. App. 1986), we conclude that the evidence preponderates in favor of the trial court's award of $8,500.00 in insurance proceeds to the surviving spouse for decedent's funeral costs, but that the evidence preponderates against the trial court's award of a $28,000.00 bank account to the surviving spouse. Affirmed in part, reversed in part, and remanded.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed in Part; Reversed in Part; and Remanded**

J. STEVEN STAFFORD, J., delivered the opinion of the Court, in which ALAN E. HIGHERS, P.J., W.S., and DAVID R. FARMER, J., joined.

Charles S. Kelly, Sr., Dyersburg, Tennessee, for the appellant, Faye Fowler.

Bruce Conley, Union City, Tennessee, for the appellee, Norma Simpson.

### OPINION

This is the second appeal of this case. In ***Simpson v. Fowler***, No. W2011-02112-COA-R3-CV, 2012 WL 3675321 (Tenn. Ct. App. Aug. 28, 2012) ("***Simpson I***"), we vacated

the order of the trial court for lack of findings under Tennessee Rule of Civil Procedure 52.01. A full recitation of the factual history of the case is set out in **Simpson I**. In the interest of continuity and judicial economy, we restate the relevant facts here:

> Appellee Norma Simpson and J.W. Simpson ("Decedent") were married on May 17, 1951. In October of 1967, the Simpsons were divorced but reconciled after eight months. The Simpsons married again in June of 1968 and they lived together until about 1990, when they again separated. At that time, Ms. Simpson moved into her mother's home, and Mr. Simpson remained in the marital residence. Although the Simpsons did not reconcile, neither filed for divorce. Mr. Simpson did not support Ms. Simpson after their final separation, except that Ms. Simpson continued her health insurance coverage under Mr. Simpson's policy.

> In 1992 or 1993, Mr. Simpson began a relationship with Appellant Faye Fowler. Mr. Simpson and Ms. Fowler never lived together, but were involved until Mr. Simpson's death on February 11, 2010. Mr. Simpson died intestate. During his relationship with Ms. Fowler, sometime in 2005, Mr. Simpson changed the ownership of his bank account at First State Bank to a joint account with right of survivorship with Ms. Fowler. Both Ms. Simpson and Ms. Fowler testified that neither of them had written checks on this account during their respective relationships with Mr. Simpson. Ms. Fowler testified that she neither deposited, nor withdrew any funds from this account, and that she thought that the account funds were comprised of Mr. Simpson's pension and social security benefits. At the time of Mr. Simpson's death, the checking account had a balance of approximately $28,000. Mr. Simpson also changed the beneficiary on both his MetLife Company, and Minnesota Life Insurance Company life insurance policies to Ms. Fowler. The total benefit under both policies was approximately $8,500. The insurance policies and the bank account totaling approximately $36,500 are the disputed assets in this lawsuit.

> On February 11, 2010, Ms. Simpson, individually and as next-of-kin of J.W. Simpson filed a complaint and application for restraining order against Ms. Fowler, seeking to set aside Decedent's transfer of the First State Bank account funds, and the proceeds of the two life insurance policies to Ms. Fowler.

On February 25, 2010, the trial court granted Ms. Simpson's request for a temporary injunction, enjoining Ms. Fowler from using or transferring any of the disputed funds. On March 10, 2010, Ms. Fowler filed her answer and counter-complaint, seeking attorney's fees and costs on the ground that Ms. Simpson's lawsuit was frivolous.

On May 17, 2011, the trial court conducted a bench trial. Following the trial, the court held that the transfers to Ms. Fowler should be set aside under Tennessee Code Annotated Section 31-1-105. On June 9, 2011, the trial court entered an order, which reads, in its entirety, as follows:

> This cause is before the Court on the 17th day of May 2011, on the Complaint of the Plaintiff, the Answer and Counter–Complaint of the Defendant, the Answer to the Counter–Complaint, the testimony of the parties and other witnesses, and from a consideration of the record and applicable authorities.
> It satisfactorily appears to the Court that Tennessee Code 31-1-105 is applicable to the facts and issues in this litigation, and that the transfers of J.W. Simpson to Faye Fowler should be set aside.
> IT IS, THEREFORE, ORDERED BY THE COURT that all transfers to Faye Fowler by J.W. Simpson, including the survivorship account at First State Bank, the change of beneficiary of policies at MetLife Company and Minnesota Life Insurance Company are all set aside, and the funds from these transfers are to be paid into the office of the Chancery Court Clerk pending the administration of the Estate of J.W. Simpson.

Ms. Fowler filed a timely notice of appeal from this order.

*Simpson I*, 2012 WL 3675321, at *1–*2. In *Simpson I*, we determined that the trial court's June 9, 2012 order was deficient in two respects. First, although the trial court made oral

-3-

findings from the bench, it failed to incorporate those findings into the June 9, 2012 order. Accordingly, we held that the order was not in compliance with Tennessee Rule of Civil Procedure 52.01, which provides, in relevant part, that: "In all actions tried upon the facts without a jury, the court shall find the facts specially and shall state separately its conclusions of law and direct the entry of the appropriate judgment." Second, we held that the June 9, 2011 order was deficient because:

> [T]he trial court appears to misapprehend the relevant law pertaining to Tennessee Code Annotated Section 31-1-105. The trial court found that the effect of the transfer to deprive Ms. Simpson of her share of the estate is sufficient to set the transfer aside under the statute. However, we hold that the statute requires that the trial court must also determine whether Mr. Simpson possessed the intent to deprive Ms. Simpson of her share of the estate as well.

*Simpson I*, 2012 WL 3675321, at *3. Tennessee Code Annotated Section 31-1-105 provides:

> Any conveyance made fraudulently to children or others, with an intent to defeat the surviving spouse of the surviving spouse's distributive or elective share, is, at the election of the surviving spouse, includable in the decedent's net estate under § 31-4-101(b), and voidable to the extent the other assets in the decedent's net estate are insufficient to fund and pay the elective share amount payable to the surviving spouse under § 31-4-101(c).

In order to give the trial court guidance upon remand, we explained the requirements of the statute as follows:

> Cases that have previously dealt with this issue make it clear that the gravamen of this action is whether the decedent spouse intended to practice fraud on the surviving spouse. In *Finley v. Finley*, 726 S.W.2d 923 (Tenn. Ct. App. 1986) the Court set forth the following factors to be considered in determining if a conveyance has been made with fraudulent intent. These factors include: (1) the consideration given for the transfer, (2) the size of the transfer in relation to the decedent's total estate, (3) the time between the transfer and the transferor's

-4-

death, (4) the relations which existed between the spouses at the time of the transfer, (5) the source from which the property came, (6) whether the transfer was illusory, and (7) whether the surviving spouse was adequately provided for in the will. *Id*. at 924.

In *Warren v. Compton*, 626 S.W.2d 12 (Tenn. Ct. App. 1981), this Court dealt with the same issue, and stated:

> However, we do not limit our considerations to those factors alone. Circumstances which establish fraudulent intent are as varied as the ingenuity of the human mind may devise. All facts and circumstances surrounding the transfer must be considered.

*Id*. at 17. Furthermore, as stated in *Sherrill v. Mallicote*, 417 S.W.2d 798 (Tenn. Ct. App. 1967): "In cases of this type there can be no fixed rule of determining when a transfer or gift is fraudulent . . . each case must be determined on its own facts and circumstances." *Id*. at 802.

\* \* \*

Accordingly, under a proper application of Tennessee Code Annotated Section 31-1-105, the trial court should consider the objective factors as set forth in *Finley*, as well as any other relevant considerations, to determine whether the decedent in fact intended to commit fraud or intentionally deny the surviving spouse of his or her share of the estate. *See Finley v. Finley*, 726 S.W .2d 923, 925 (Tenn. Ct. App.1986) (noting that the court should consider whether the facts supporting each factor "may be taken as an indication of fraud"). Consequently, the court may rely upon the effect of the transfer, but must actually find that the effect of the transfer supports a finding of intent to deprive on the part of the decedent spouse. Here, the trial court makes no such finding. Rather, the court simply concluded that because the "effect" of the transfer was to deprive Ms. Simpson of her widow's share of the estate, that

finding was sufficient to set aside the transfers. While it may be true that the transfers worked to deprive Ms. Simpson of her widow's share, without a finding of intent to accomplish this result on the part of Mr. Simpson, the fact that the transfer lessened Ms. Simpson's share of the Decedent's estate is not sufficient to set aside the transfers under Tennessee Code Annotated Section 31-1-105. *See **McClure v. Stegall***, 729 S.W.2d 263 (Tenn. Ct. App. 1987) (holding that the surviving spouse failed to prove that the decedent intended to deprive her of her distributive share by placing over $150,000.00 in certificates of deposit in the decedent's mother's name). Because the trial court did not make a specific finding of fraud or intent to deprive, it is impossible for this Court to review the trial court's order in any meaningful way.

*Simpson I*, 2012 WL 3675321, at *5–7 (footnote in original). Although we vacated the trial court's June 9, 2011 order in *Simpson I*, we noted:

Our holding here does not preclude the trial court from allowing the parties to offer more, or different, evidence. Although we concede that the trial court may reach the same conclusion, it is required to make specific findings of fact and conclusions of law in its order, including (if the same outcome is reached) a finding that Mr. Simpson's intent, in making the transfers to Ms. Fowler, were for purposes of fraud or were made with intent to deprive Ms. Simpson of her share of the estate.

*Simpson I*, 2012 WL 3675321, at *8.

A remand hearing was held on June 20, 2013. On August 14, 2013, the trial court entered a document styled "Judgment," wherein the court made specific findings of fact and conclusions of law. However, the trial court neither adjudicated any matters within the "Judgment," nor did it incorporate its prior order. Ms. Fowler filed a notice of appeal from this "Judgment" on September 11, 2013. Upon review, we determined that because the trial court's June 9, 2011 order was vacated, and because the August 14, 2013 "Judgment" did not adjudicate anything, it was not a valid order. Accordingly, we instructed the trial court to cure this defect, which it has done by amended order of January 17, 2014. In addition, the court made the following, specific findings of fact and conclusions of law:

On remand, this Court has considered the entire record[], including the additional testimony of Faye Fowler on the June

-6-

20, 2013 rehearing, and makes the following findings of fact and conclusions of law:

## FACTS

Norma Simpson and J.W. Simpson were married on May 17, 1951. They divorced in 1967 and remarried June 29, 1968. They separated in the early 1990s, but never divorced. J.W. Simpson began a relationship with Faye Fowler in 1993. J.W. Simpson died intestate on February 11, 2010.

J.W. Simpson opened a checking account in his sole name at First State Bank on March 30, 1991. On January 4, 2005, he added Faye Fowler as a joint owner with right of survivorship. Ms. Fowler never deposited any funds into this account or wrote checks. At the time of J.W. Simpson's death, the account contained approximately $28,000.00. The account contained Mr. Simpson's pension and social security benefits.

On November 30, 2007, J.W. Simpson named Faye Fowler as the beneficiary of his life insurance policy with Minnesota Life. Mr. Simpson also made Ms. Fowler the beneficiary of a Met Life policy with a death benefit of $845.00. The policies provided a total approximate death benefit of $8,500.00.

Ms. Fowler testified it was her obligation to pay Mr. Simpson's funeral bill from the life insurance policies. Norma Simpson paid the funeral expense of $7,475.52.

## LAW

[Here, the trial court set out Tennessee Code Annotated Section 31-1-105, which we have included above. The court also set out the *Finley* requirements, which are also set out in the excerpt from *Simpson I*, *supra*. Applying these factors, the trial court went on to conclude:]

In the present case, the proof is not disputed that (1) there was no consideration for the transfers in question; (2) the checking account was the decedent's major asset; (3) the transfers occurred some three to five years before the decedent's death; (4) the only relationship between spouses at the time of the transfers was Mr. Simpson kept Mrs. Simpson on his

-7-

Goodyear health insurance policy, but he did not otherwise support her; (5) the source of all the funds in the checking account came from Mr. Simpson; (6) there is no evidence the transfers were illusory; and (7) J.W. Simpson died without a will, therefore, he made no provision for Norma Simpson's support.

To determine fraudulent intent, the Court must consider all facts and circumstances of the case. *Warren v. Compton* . . . .

At trial and on remand, Faye Fowler relies on the fact she became an owner, rather than a beneficiary, of the joint checking account with right of survivorship and these funds pass[ed] to her by operation of law outside of the J.W. Simpson estate. T.C.A. §45-2-703(f)(1).[1] The Court agrees that J.W. Simpson intended to create an ownership interest in the checking account, however, the Court finds the provision of this statute does not apply to the facts of this case if J.W. Simpson transferred the account fraudulently with the intent to defeat his wife of her distributive or elective share.

## CONCLUSION

Based on the objective factors in *Finley*, the other relevant factors of this case, including Ms. Fowler's acknowledgment [that] the life insurance proceeds were to be used to pay for Mr. Simpson's funeral; as well as the effect of these transfers; the Court finds the decedent, J.W. Simpson,

---

[1] Tennessee Code Annotated Section 45-2-703(f)(1) provides:

(f) Without incurring any liability, any bank may, but shall not be required to, provide to depositors disclosures in form similar to the following:

(1) Joint tenants with right of survivorship. This designation means that the deposit account or certificate of deposit shall become the property of each owner as joint tenants, and that the survivor is entitled to all moneys in the account or represented by the certificate even if the first person to die had a will specifically directing disposition to someone else. The bank may release all moneys in the account or represented by the certificate to, or honor checks or orders drawn by, or withdrawal requests from, the survivor upon the death of any joint tenant . . .

fraudulently transferred his checking account and life insurance to Faye Fowler with the intent to defeat his spouse, Norma Simpson, of her distributive or elective share.

The court also incorporated its August 14, 2013 order, by reference, into the foregoing order. Based upon its findings of fact and conclusions of law, the trial court ordered the life insurance proceeds from both of Mr. Simpson's policies, along with the proceeds of the First State Bank account, to be paid to Ms. Simpson. Ms. Fowler appeals. She raises one issue for review, which we take from her brief:

> Whether the trial court erred in setting aside the joint tenant with the right of survivorship bank account and whether the trial court [erred in] holding that Mrs. Simpson was due the life insurance proceeds payable to Mrs. Fowler.

Because this case was tried by the court, sitting without a jury, we review the factual issues *de novo* upon the record with a presumption of correctness. Tenn. R. App. P. 13(d). Unless the evidence preponderates against the trial court's findings, we must affirm, absent error of law. *Id*. In order for the evidence to preponderate against the trial court's findings, it must support another finding of fact with greater convincing effect. *Walker v. Sidney Gilreath & Assocs.*, 40 S.W.3d 66, 71 (Tenn. Ct. App. 2000).

As an initial matter, we note that, in her appellate brief, Ms. Fowler argues, *inter alia*, that Tennessee Code Annotated Section 45-2-703 should govern this lawsuit. As set out in footnote 1, *supra*, this statute governs joint tenant with right of survivorship bank accounts, and indicates that this designation "means that the deposit account. . . shall become the property of each owner as joint tenants [upon the death of the other owner]." This argument, however, is outside the law of the case. The phrase "law of the case" refers to a legal doctrine which generally prohibits reconsideration of issues that have already been decided in a prior appeal of the same case. *Memphis Publ'g Co. v. Tennessee Petroleum Underground Storage Tank Bd.*, 975 S.W.2d 303, 306 (Tenn. 1998) (citations omitted).

> Therefore, when an initial appeal results in a remand to the trial court, the decision of the appellate court establishes the law of the case which generally must be followed upon remand by the trial court, and by an appellate court if a second appeal is taken from the judgment of the trial court entered after remand. There are limited circumstances which may justify reconsideration of an issue which [] was decided in a prior appeal: (1) the evidence offered at a trial or hearing after remand was substantially

different from the evidence in the initial proceeding; (2) the prior ruling was clearly erroneous and would result in a manifest injustice if allowed to stand; or (3) the prior decision is contrary to a change in the controlling law which has occurred between the first and second appeal.

*Memphis Publ'g*, 975 S.W.2d at 306 (citations omitted). In *Simpson I*, this Court held that Tennessee Code Annotated Section 31-1-105 governs the case. Citing *Finley v. Finley*, 726 S.W.2d 923 (Tenn. Ct. App. 1986), we noted that the gravamen of this action is whether the decedent spouse, Mr. Simpson, intended to practice fraud on the surviving spouse, Ms. Simpson, in making Ms. Fowler the beneficiary of his bank account and insurance policies. Therefore, the designation of the bank account as a joint tenancy with right of survivorship is secondary to the question of whether Mr. Simpson intended to commit fraud or intended to intentionally deny Ms. Simpson her share of the estate. *Id*. Thus, the law of the case is Tennessee Code Annotated Section 31-1-305, and the type of bank account is irrelevant upon a finding of fraud or intent to deny the surviving spouse's share under that statute. Likewise, if the evidence preponderates in favor of the trial court's finding that Mr. Simpson named Ms. Fowler as the beneficiary of the disputed life insurance policies in order to deny Ms. Simpson her spousal share of the proceeds, then these transactions may also be set aside under Tennessee Code Annotated Section 31-1-305. Consequently, Ms. Fowler's arguments that the bank account and the insurance proceeds pass outside Mr. Simpson's estate is true only insofar as her interest in those proceeds was not created as a result of Mr. Simpson's intent to deny Ms. Simpson her spousal share of these assets.

In *Simpson I*, we outlined the requirements under Tennessee Code Annotated Section 31-1-305, and the relevant caselaw. The question presented in this appeal is whether the evidence preponderates against the trial court's finding that Mr. Simpson committed fraud or intended to deny Ms. Simpson her share of the estate by his transfers.

In reaching its decision the trial court properly considered the factors set out in *Finley v. Finley*, 726 S.W.2d 923 (Tenn. Ct. App. 1986), which factors include: (1) the consideration given for the transfer, (2) the size of the transfer in relation to the decedent's total estate, (3) the time between the transfer and the transferor's death, (4) the relations which existed between the spouses at the time of the transfer, (5) the source from which the property came, (6) whether the transfer was illusory, and (7) whether the surviving spouse was adequately provided for in the will. *Id*. at 924. However, these factors should not be applied mechanically, but rather, "the weight and significance to be given to each factor [will depend upon] the facts of each particular case." *Id.* at 926; *see also Warren v. Compton*, 626 S.W.2d 12, 17 (Tenn. Ct. App. 1981) ("All facts and circumstances surrounding the transfer must be considered."). In determining whether the conveyance was fraudulently made with

an intent to defeat the spouse's interest, "the Court should not mechanically list the factors favorable to one party and those favorable to another and add up the total and base his judgment upon that alone, but instead, should consider the weight and significance to be given to each factor under the facts of each particular case." *Finley*, 726 S.W.2d at 925–926. Although the trial court listed the applicable factors, it did not state what weight or significance it attributed to each factor. Even though the court's order correctly notes that "[t]o determine fraudulent intent, the Court must consider all facts and circumstances of the case," its analysis stops there. Thereafter, the court immediately addresses Ms. Fowler's contention that Tennessee Code Annotated Section 45-2-703 is applicable, but it never returns to "consider all facts and circumstances of the case." Rather, it appears that, in reaching its decision that Mr. Simpson committed fraud in this case," the court placed substantial emphasis on the "effect" of the transfers: "[b]ased on the objective factors in *Finley*, the other relevant factors of this case . . . as well as the effect of these transfers." The "other relevant factors of this case" are not enumerated except for the fact that "Ms. Fowler acknowledg[ed] [that] the life insurance proceeds were to be used for Mr. Simpson's funeral." This fact, however, goes more to Ms. Fowler's actions than to Mr. Simpson's. The fact that Ms. Fowler did not use the insurance proceeds for the funeral does not answer the question of whether Mr. Simpson intended to deprive Ms. Simpson of these assets by naming Ms. Fowler as his beneficiary. As discussed, *infra*, after reviewing the entire record in this case, we are of the opinion that certain of the *Finley* factors should be given more weight in this case based upon the particular facts of this case. Before addressing those specific factors, we first pause to discuss the type of fraud or intent that is contemplated under Tennessee Code Annotated Section 31-1-105.

The type of fraud that is at issue in this case, is "fraud in law," which is also known as "legal fraud," or "constructive fraud." As explained by Bryan Garner, *A Dictionary of Modern Legal Usage* 374 (2nd ed.1995):

> Fraud in law is fraud that is presumed under the circumstances, as, for example, when a debtor transfers assets and thereby impairs the efforts of creditors to collect sums due . . . or an unintentional deception that causes injury to another.

As noted by this Court in *Sherrill v. Mallicote*, 417 S.W.2d 798 (Tenn. Ct. App. 1967), "[w]hile the effect of the transfer is certainly a relevant consideration, even if the effect of the disputed transfer is to deprive the surviving spouse of his or her share of the estate, the court must still find that the decedent's intent was to do so." *Id*.; *accord Warren v. Compton*, 626 S.W.2d at 15-16 ("The courts of Tennessee have interpreted [the predecessor statutes to Tennessee Code Annotated Section 31-1-105] to apply only to conveyances made by husband with actual intent to defeat the widow of her dower . . . ."); *accord* Pritchard on

the Law of Wills and Administration of Estates, Chapter 20-24, §835 n.32 (2009) ("Intent to defraud surviving spouse must be clear, though it need not be expressly stated.") (citing *Hughes' Lessee v. Shaw*, 48 Tenn. 323, 1827 WL 672 (Tenn. 1827)). Undoubtedly, the effect of Mr. Simpson's actions in making Ms. Fowler his joint tenant on the bank account, and in making her his beneficiary on the life insurance policies, was to deprive Ms. Simpson of these assets. However, the inquiry must go further. The question is whether, at the time of the transfers, Mr. Simpson was acting under scienter, i.e., "guilty knowledge," that his actions would deny Ms. Simpson of her spousal share of his estate, and that he acted with the intent to do so. *Warren*, 626 S.W.2d at 17.

As noted above, the factors set out in *Finley* are not a "one size fits all" proposition. Rather, in almost all cases, the deciding court must look outside these factors to make a determination on the intent requirement of Tennessee Code Annotated Section 31-1-105. At a minimum, the court will usually have to give different weight to these factors based upon the particular facts of each case. The instant case is no different. In fact, the circumstances in this case are fairly unique. Here, we have a married couple that have not resided in the same home since the early 1990s, but have not gone through the divorce process. Despite the fact that he and Ms. Simpson were still legally married, Mr. Simpson had a long-term relationship with Ms. Fowler. The record indicates that Mr. Simpson and Ms. Fowler began their relationship around 1993, and that they remained in that relationship until his death, a period of approximately seventeen years. The record further indicates that Ms. Simpson was aware of Mr. Simpson's relationship with Ms. Fowler and that she did not seek a divorce because of it. These facts raise questions around the fourth *Finley* factor, i.e., "the relations which existed between the spouses at the time of the transfer." We find guidance in the *Warren v. Compton* case. In *Warren*, this Court applied the *Finley* factors and found that a $40,000.00 gift that Oliver Warren, the deceased husband, had made to his girlfriend, Opalyne Compton, shortly before he died was not a fraudulent conveyance. We reasoned that Mr. Warren's donative intent was justified by the long relationship between Mr. Warren and Ms. Compton, and the care and attention she gave him during the difficult months of his last illness. In *Warren*, we observed that "a strained marriage relationship is a sword which cuts both ways." That is, the existence of such strains under *Finley* factor four could be used as proof of a decedent spouse's motivation to fraudulently defeat a surviving spouse's rights. But, on the other side of the equation, "[t]he surviving spouse could have been so inconsiderate, cold, and self-centered as to justify a transfer of property by the other spouse to those in whom he found solace, comfort, and care." *Warren*, 626 S.W.2d at 18. In the instant case, the evidence does not suggest a particularly acrimonious relationship between Ms. Simpson and her estranged husband. In fact, Ms. Simpson testified that she was in the home immediately after Mr. Simpson died:

Q [to Ms. Simpson]. Okay. And I believe all of you were

-12-

present when Mr. Simpson was in the home deceased.

A. Yes, sir.

Q. He died at home and–

A. Yes, sir.

Q. –you were there, and Ms. Fowler was there, and some of your children were there.

A. Yes, sir.

Furthermore, it is uncontested that Ms. Simpson arranged for Mr. Simpson's burial. In addition, Ms. Simpson knew of Mr. Simpson's long-term relationship with Ms. Fowler:

Q [to Ms. Simpson]. I would assume you knew of his long-term relationship with Faye Fowler. You knew that.

A. Yes, sir.

Concerning her relationship with Mr. Simpson, Ms. Fowler testified, in relevant part, as follows:

Q [to Ms. Fowler]. And did you and Mr. Simpson live together or did you maintain separate residences?

A. We had separate residences, but we were together.

Q. Okay. How much were you together?

A. Well, I say there was only one or two days of the week maybe that we wasn't [sic] together. The rest of it we were together.

\*                             \*                             \*

Q. And during this relationship was [sic] there any third parties involved or was it just you and Mr. Simpson?

A. Just me and Mr. Simpson.

\*                             \*                             \*

Q. Okay. And during the relationship did you cook Mr. Simpson's meals?

A. Yes, I did.

Q. Did you iron his clothes?

A. Yes, I did.

-13-

Q. And did you clean his house?

A. Yes, I did.

Q. And was this on a regular basis during this seventeen years?

A. Yes, it was.

Q. Okay. And that relationship continued until his death?

A. Yes, it did. Could I say that he had surgery and I took care of him then? I went over daily and bathed him.

Q. Okay.

A. Took care of him.

Q. All right. He had some kind of serious surgery?

A Yes, he had prostate cancer.

Q. Okay. And you were his care giver during that period of time?

A. Yes, I–Yes, I was.

Based upon the evidence, we conclude that this case is analogous to *Warren* in that the facts suggest that Mr. Simpson's intent in transferring the disputed assets to Ms. Fowler was not to usurp Ms. Simpson's spousal rights because there was no overt animosity between these two at the time the transfers were made. Rather, it appears that, based upon his long term relationship with Ms. Fowler, Mr. Simpson's donative intent, like the decedent's in *Warren*, was justified by the long relationship he had with Ms. Fowler, and the care she provided him.[2]

Concerning the second *Finley* factor, i.e., the size of the transfer in relation to the decedent's total estate, Ms. Fowler argues that the estate was not merely comprised of the bank account and insurance policies, but that it also included Mr. Simpson's home, its contents, and two vehicles, all of which passed to Ms. Simpson upon his death. In evaluating her argument, we cannot lose sight of the fact that Ms. Simpson was, at the time of Mr. Simpson's death, his legal spouse. The home where Mr. Simpson lived was the marital home that he had shared with Ms. Simpson until she left it around 1990. So, unlike Ms. Fowler, and in the absence of any countervailing evidence, it appears that Ms. Simpson had a tenancy by the entirety with Mr. Simpson in the marital residence. "A conveyance to a married couple-silent as to the type of ownership-creates a presumption of a tenancy by the entirety." *Dickson v. Long*, No. M2008-00279-COA-R3-CV, 2009 WL 961784, at * 13 (Tenn. Ct. App. Apr. 8, 2009) (citing *In re Estate of Russell*, No. 01A01-9611-PB-00516, 1997 WL

_____

[2] As noted in *Simpson I*, although the *Warren* case was decided prior to the current enactment of Tennessee Code Annotated Section 31-1-105, and the statute has changed drastically since its first enactment, the requirement of intentionality has remained the same. Accordingly, *Warren* is applicable insofar as it addresses the intent of the decedent spouse.

-14-

249961, at *7 (Tenn. Ct. App. May 14, 1997); ***Bost v. Johnson***, 175 Tenn. 232, 133 S.W.2d 491 (1939); ***Young v. Brown***, 136 Tenn. 184, 188 S.W. 1149 (1916)). Tenancy by the entirety is property ownership unique to married persons. Property acquired during a marriage is presumed to be held by the entirety, unless proven otherwise. ***Batson v. Batson***, 769 S.W.2d 849, 858 (Tenn. Ct. App.1988). "The essential characteristic of tenancy by the entirety is that 'each spouse is seized of the whole or the entirety and not of a share, moiety, or divisible part.'" ***Grahl v. Davis***, 971 S.W.2d 373, 378 (Tenn.1998) (quoting ***Sloan v. Jones***, 192 Tenn. 400, 241 S.W.2d 506, 507 (Tenn.1951)). "[O]nce a tenancy by the entirety is created, it can be terminated only when both convey, when one spouse dies and the survivor becomes owner of the whole, or when the survivorship is dissolved by divorce and the parties become tenants in common in the property." ***White v. Watson***, 571 S.W.2d 493, 495 (Tenn. Ct. App.1978). Because they were never divorced, the legal construct concerning the house remained unchanged and, accordingly, Ms. Simpson was always "seized of the whole." Accordingly, the house passed to her outside the estate. In addition, although the record does not elaborate on the specific types of personalty, or the value, Ms. Simpson testified that she took all of the contents of the house, including furnishings, tools, and the like.

Furthermore, Ms. Simpson testified that she received spouse death benefits from Goodyear, Mr. Simpson's former employer, in the total amount of $4,500.00:

> Well, I [i.e., Ms. Simpson] got two checks, one for thirty-five hundred and one for a thousand that came from Goodyear, spouse-only, one-time payment.

In addition, Ms. Simpson took possession of Mr. Simpson's two vehicles:

> Q [to Ms. Simpson]. And did Mr. Simpson have these automobiles . . . at his house when he died?
> A. Yes, sir.
> Q. Okay. And did somebody tell you to just take those, or did you just do it or what?
> A. I just did it.
>
> \*                          \*                          \*
>
> Q. Okay. And you've still got both of them–
> A. Yes, sir.
> Q. –and still use both of them.
> A. Yes, sir.

-15-

It does not appear that the trial court considered all of Mr. Simpson's assets in reaching its conclusion that the proceeds of the disputed bank account and insurance policies comprised the majority of his estate under the second *Finely* factor. While the $28,000.00 bank account, and the $8,500.00 in insurance proceeds certainly comprised a significant portion of Mr. Simpson's total estate, in light of the fact that there were two operable vehicles, a household of personalty, and additional death benefits from Goodyear, the evidence does not establish that the bank account and insurance proceeds constituted the majority of the estate. Accordingly, this factor does not appear to favor either party.

The record indicates that Mr. Simpson changed ownership of the bank account on January 15, 2005. He signed the beneficiary designation and change request for the Minnesota Life Policy on November 30, 2007. Although the date of the change of beneficiary on the MetLife policy is not in the record, we glean from the evidence that Mr. Simpson made this change at or about the same time that he changed the Minnesota Life Policy. Mr. Simpson died on February 11, 2010. Considering *Finley* factor three, i.e., the time between the transfer and the transferor's death, the evidence does not suggest that Mr. Simpson changed ownership of his bank account, or beneficiary of his life insurance in anticipation of his death, or based upon any clear desire to keep Ms. Simpson from reaching these assets. Although Mr. Simpson had suffered from prostate cancer, as discussed in Ms. Fowler's testimony, *supra*, his death certificate indicates that the cause of death was cardiac arrest. There is no indication in the record that, at the time of the disputed transfers, Mr. Simpson was anticipating his death based upon a long-term illness. Rather, it appears that Mr. Simpson's motive was not vindictive, but was an attempt to ensure that he provided for his long-term companion, Ms. Fowler. In addition, it is undisputed in the record that Mr. Simpson intended the proceeds from the disputed insurance policies to be used for his funeral expenses. Given the long-term nature of his relationship with Ms. Fowler, and his estrangement from Ms. Simpson, it is reasonable to assume that he thought Ms. Fowler would be the one to make his final arrangements. The record indicates that Ms. Fowler's attempt to make funeral arrangements may have been hindered by the fact that Ms. Simpson and her children (with Mr. Simpson) stepped in to make these arrangements. Regardless, from the totality of the circumstances, we cannot conclude that the timing of the disputed transfers indicates any ill intent to deprive Ms. Simpson of her share of the estate.

Concerning the proceeds from the insurance policy, it is undisputed that these proceeds were to be used for Mr. Simpson's funeral. Yet, it is undisputed that Ms. Simpson paid for the funeral without using these funds. Trial Exhibit 1 is an invoice from Leitherland Funeral Home, showing total funeral expenses of $7,475.52. Because the insurance proceeds were intended to cover the funeral expenses, and because Ms. Simpson bore these costs, we conclude that the trial court correctly awarded Ms. Simpson the $8,500.00 in insurance proceeds. In this regard, Ms. Simpson was reimbursed for her expenditures, and

the insurance proceeds were applied to funeral costs as Mr. Simpson intended. Accordingly, we affirm this portion of the trial court's judgment, i.e., $8,500.00 to Ms. Simpson.

However, concerning the proceeds from the bank account, i.e., $28,000.00, from the totality of the circumstance, in light of the applicable *Finley* factors, and based upon the foregoing discussion, we conclude that the evidence preponderates against the trial court's finding that Mr. Simpson's intent was to deprive Ms. Simpson of this asset. Specifically, as previously discussed, *Finley* factors three (i.e., "the time between the transfer and the transferor's death"), and four (i.e., "the relations which existed between the spouses at the time of the transfer") weigh heavily in favor of finding that Mr. Simpson's intent was donative, rather than to deprive Ms. Simpson of her share of the estate. *See Finley*, 726 S.W.2d at 924. However, there was no monetary consideration for any of the disputed transfers and Mr. Simpson executed no will to provide for Ms. Simpson. Accordingly, both *Finley* factors one and seven weigh in favor of Ms. Simpson. Further, it is undisputed that all funds contained in the disputed transfers belonged to Mr. Simpson and that the transfers were not illusory; thus, *Finley* factors five and six weigh in favor of neither party. *Id.* Finally, we have concluded that *Finley* factor two (i.e., the size of the transfer in relation to the decedent's total estate), also weighs in favor of neither party; although the bank account was a large portion of Mr. Simpson's estate, his estate contained other items, all of which passed to Ms. Simpson. *Id.* Based on the undisputed evidence, it appears that both Ms. Simpson and Ms. Fowler are evenly matched with regard to the number of *Finley* factors in their favor. However, as previously stated, the court is not directed to simply add up the number of factors in each party's favor, but must consider "the weight and significance to be given to each factor."*Id.* at 926. Based on the particular circumstances of this case, we conclude that *Finley* factors three and four (i.e., the timing of the transfer and the relationship between the parties) are significant and weigh against the trial court's finding that Mr. Simpson intended to deprive Ms. Simpson of her share of the estate. Further, the factors that weigh in Ms. Simpson's favor (i.e., the lack of consideration and the failure to provide for Ms. Simpson in a will) carry less weight in our analysis because the evidence is undisputed (1) Ms. Fowler contributed to Mr. Simpson's life in other, non-monetary ways, like in the *Warren* case; and (2) Mr. Simpson had not been providing for Ms. Simpson for over a decade. Finally, the burden was on Ms. Simpson to prove, by a preponderance of the evidence, that Mr. Simpson had the intent to deprive her of her share in the estate in order to void the transfers. *See id.* at 924 (noting that the trial court ruled that wife had not met her burden, and affirming the trial court). Considering the totality of the circumstances, and giving appropriate weight to the *Finley* factors, we must conclude that Ms. Simpson failed to meet her burden with regard to the bank account. Rather, from the totality of the circumstances, and in light of the nature and duration of his relationship with Ms. Fowler, and in light of the *Warren* case, we conclude that the record preponderates in favor of concluding that Mr. Simpson's intent in entering a joint tenancy with Ms. Fowler on the bank

account was to ensure that his long-term companion was provided for after his death. Accordingly, we reverse the award of the $28,000.00 to Ms. Simpson, and remand for entry of judgment in this amount to Ms. Fowler.

For the foregoing reasons, we affirm the order of the trial court concerning the award of $8,500.00 in insurance proceeds to Ms. Simpson. We reverse the trial court's order concerning the award of the $28,000.00 bank account to Ms. Simpson. We remand the case for such further proceedings as may be necessary and are consistent with this Opinion, including, but not limited to, entry of judgment in the amount of $28,000.00 in favor of Ms. Fowler. Costs of the appeal are assessed one-half to the Appellant, Faye Fowler, and her surety, and one-half to the Appellee, Norma Simpson, for all of which execution may issue if necessary.

_____
J. STEVEN STAFFORD, JUDGE